## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DWAYNE DIGGS, DEMETRIUS GOSHEN, JAMES JACKS, DAVID JACKSON, RAPHAEL REBOLLO, LUIS SALDANA, DAVONGIE STONE, XAVIER VALENTIN-SOTO, and DANAVIAN DANIEL, <br><br> on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br>    v. <br><br> CAROL MICI, Commissioner of the Massachusetts Department of Correction; PAUL HENDERSON, former Deputy Commissioner of Field Services; PATRICK DEPALO, Deputy Commissioner of Field Services; CHARLES PRIMACK, Director of Special Operations; STEVEN KENNEWAY, former Superintendent of Souza-Baranowski Correctional Center; DEAN GRAY, Superintendent of Souza-Baranowski Correctional Center; RONALD GARDNER, Director of Security at Souza-Baranowski Correctional Center; Captains DONALD DENOMME and DAVID BRIEN; Lieutenants PAUL BIRRI, KEITH HOULE, ROBERT DESCHENE, JAMES ALLAIN, and JAMES GEARIN; Sergeant ROBERT D'AMADIO; Correction Officers JOSEPH BELLINI and JOHN MADDEN; and K9 Officer EVAN LARANJO, <br><br> Defendants. | Case No. 4:22-cv-40003 |

## CLASS ACTION COMPLAINT
## FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Danavian Daniel, Dwayne Diggs, Demetrius Goshen, James Jacks, David Jackson, Raphael Rebollo, Luis Saldana, Davongie Stone, and Xavier Valentin-Soto, on behalf of themselves and all others similarly situated, seek damages and declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the Constitution of the United States and allege as follows:

## INTRODUCTION

1.      On the morning of January 10, 2020, long-simmering tensions between a small group of prisoners and officers in the N1 Unit at Souza-Baranowski Correctional Center ("SBCC") culminated in an altercation, during which several officers were injured (the "N1 Incident"). The situation was soon brought under control, and within hours, all prisoners who were suspected of involvement in the attack were removed from SBCC and transferred to different prisons. None of the prisoners remaining in N1 or elsewhere in SBCC had participated in the N1 Incident. Nevertheless, despite the fact that any immediate threat to SBCC officers had been neutralized, Massachusetts Department of Correction ("DOC") staff unjustifiably and cruelly subjected the individuals remaining in SBCC custody to a brutal and lengthy campaign of excessive force and unconstitutional treatment (the "Retaliatory Force Campaign").

2.      The Retaliatory Force Campaign consisted of weeks of unprovoked, retaliatory violence against SBCC prisoners, and amounted to an unlawful, orchestrated effort to intimidate, injure, and violate the rights of prisoners in retaliation for the N1 Incident, despite the fact that those individuals were not actually involved in the incident. Defendant Carol Mici, the DOC Commissioner, and the other high-ranking DOC officials named as Defendants sanctioned the brutality. On information and belief,

Defendant Paul Henderson, then DOC Deputy Commissioner of Field Services, instructed officers to "send a message" and told them, "The gloves are off."

3.      The Retaliatory Force Campaign began on January 10, 2020, immediately following the N1 Incident, lasted through at least February 6, 2020, and consisted of officers attacking more than 100 prisoners using extreme, malicious, and cruel methods of force designed not to restore order, but to inflict pain, fear, and trauma. This unconstitutional brutality included beating and kicking prisoners; gouging eyes; grabbing testicles; smashing faces into the ground or wall; deploying Taser guns, pepper ball guns, and other chemical agents; ordering K9s to menace and bite prisoners; and excessively tightening handcuffs and forcing prisoners' arms into unnatural and painful positions, among other positional torture tactics.

4.      Officers targeted Black and Latinx prisoners for especially brutal and degrading treatment, such as yanking and ripping out dreadlocks and braids and shouting racist comments and slurs as the officers assaulted them. Some officers wore a white supremacist logo on their helmets.

5.      Officers subjected prisoners to other dehumanizing, humiliating, and punitive actions, including being strip searched in view of numerous other prisoners and staff; being led barefoot through toilet water and human waste; having personal property destroyed; and being denied medical and mental health care.

6.      The Retaliatory Force Campaign was planned, encouraged, and condoned by supervisory Defendants at SBCC and at the highest levels of DOC. Defendant Mici authorized the use of tactical teams, which are groups of specially outfitted prison officers assigned to respond to disturbances with special weapons and tactics.  These Defendants were aware of and approved of tactical teams' use of extreme and unlawful

force against prisoners throughout the Retaliatory Force Campaign. These Defendants were present on numerous occasions when officers used excessive and unjustified force against prisoners, but allowed it to continue.

7.      The Retaliatory Force Campaign is just one example of a history of unconstitutional violence by tactical teams and DOC staff against SBCC prisoners. Far from opposing this misconduct and seeking to end this pattern of unconstitutional abuse, Defendants have authorized and condoned practices and customs that allow officers to violate prisoners' rights with impunity.

8.      Defendants' conduct constituted cruel and unusual punishment in violation of the rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution, and racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

9.      Plaintiffs therefore seek, on behalf of themselves and all others similarly situated to them, damages for injuries suffered due to violations of their rights during the Retaliatory Force Campaign, and declaratory and injunctive relief to remedy Defendants' continuing constitutional violations.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant 42 U.S.C. § 1983 to vindicate rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

11.     The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and DOC Headquarters is in this judicial district.

## PARTIES

### Plaintiffs

14.     Plaintiff Dwayne Diggs ("Mr. Diggs") is a 30-year-old Black man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Diggs was housed at SBCC. Mr. Diggs brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign, and all individuals who are now, or who will be in the future, incarcerated at SBCC. Mr. Diggs is currently incarcerated at SBCC.

15.     Plaintiff Demetrius Goshen ("Mr. Goshen") is a 25-year-old Black man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Goshen was housed at SBCC. Mr. Goshen brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign. Mr. Goshen is currently incarcerated at MCI-Shirley.

16.     Plaintiff James Jacks ("Mr. Jacks") is a 37-year-old Black man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Jacks was housed at

SBCC. Mr. Jacks brings this action on behalf of himself and all others similarly situated to him— namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign, and all individuals who are now, or who will be in the future, incarcerated at SBCC. Mr. Jacks is currently incarcerated at SBCC.

17.     Plaintiff David Jackson ("Mr. Jackson") is a 57-year-old Black man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Jackson was housed at SBCC. Mr. Jackson brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign. Mr. Jackson is currently incarcerated at MCI-Norfolk.

18.     Plaintiff Raphael Rebollo ("Mr. Rebollo") is a 35-year-old Latinx man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Rebollo was housed at SBCC. Mr. Rebollo brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign, and all individuals who are now, or who will be in the future, incarcerated at SBCC. Mr. Rebollo is currently incarcerated at SBCC.

19.     Plaintiff Luis Saldana ("Mr. Saldana") is a 37-year-old Latinx man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Saldana was housed at SBCC. Mr. Saldana brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign. Mr. Saldana is currently incarcerated at MCI-Shirley.

20.      Plaintiff Davongie Stone ("Mr. Stone") is a 24-year-old Black man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Stone was housed at SBCC. Mr. Stone brings this action on behalf of himself and all others similarly situated to him— namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign, and all individuals who are now, or who will be in the future, incarcerated at SBCC. Mr. Stone is currently incarcerated at SBCC.

21.      Plaintiff Xavier Valentin-Soto ("Mr. Valentin-Soto") is a 34-year-old Latinx man imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Valentin-Soto was housed at SBCC. Mr. Valentin-Soto brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign. Mr. Valentin-Soto is currently incarcerated at MCI-Shirley.

22.      Plaintiff Danavian Daniel ("Mr. Daniel") is a 29-year-old Black man formerly imprisoned in the custody of DOC. During the Retaliatory Force Campaign, Mr. Daniel was housed at SBCC. Mr. Daniel brings this action on behalf of himself and all others similarly situated to him—namely, all prisoners housed at SBCC who were subjected to unlawful conduct and violations of their constitutional rights during the Retaliatory Force Campaign. Mr. Daniel is currently a resident of Massachusetts and is no longer in the custody of DOC.

**Defendants**

23      Defendant Carol Mici ("Defendant Mici") is now, and was during the Retaliatory Force Campaign, the DOC Commissioner. Under G.L. c. 124, §§ 1 (a), (c), (i),

and (q), she is responsible for the administration of state correctional facilities in accordance with federal and state law, the establishment and enforcement of standards for all state correctional facilities, the investigation of grievances and reports of staff misconduct, and the establishment and enforcement of standards relating to the care, custody, and safety of all persons confined in state correctional facilities. She must authorize all uses of the Special Operations Division, including tactical teams. She was and is responsible for approving the use of chemical agents, K9s, pepper ball guns, Taser guns and other special weapons against prisoners. She had and has sole authority to end a lockdown. On January 10, 2020, Defendant Mici declared a major disorder, and authorized the lockdown of SBCC, which remained locked down throughout the Retaliatory Force Campaign. During this period, Defendant Mici was in daily and sometimes hourly communication with Defendant Steven P. Kenneway about events at SBCC. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Mici was acting within the scope of her employment as an employee of DOC and under color of state law. She is sued in her individual and official capacities.

24.     Defendant Paul Henderson ("Defendant Henderson") was Deputy Commissioner of Field Services at DOC during the Retaliatory Force Campaign. His responsibilities included overseeing all operations and activities of the Special Operations Unit and Office of Investigative Services of DOC in accordance with federal and state law. Defendant Henderson is currently assigned to the DOC Special Operations K9 Unit. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Henderson was acting within the

scope of his employment as an employee of DOC and under color of state law. He is sued in his individual and official capacities.

25.     Defendant Patrick DePalo ("Defendant DePalo") was the Assistant Deputy Commissioner of Field Services for DOC during the Retaliatory Force Campaign. Defendant DePalo is now the Deputy Commissioner of Field Services for DOC. His responsibilities include overseeing all operations and activities of the DOC Special Operations Unit and Office of Investigative Services, in accordance with federal and state law. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant DePalo was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his official capacity.

26.     Defendant Charles Primack ("Defendant Primack") was the Director of the DOC Special Operations Unit during the Retaliatory Force Campaign. In that role, he was responsible for the daily operations of the unit, including deployment of tactical teams. Defendant Primack was responsible for ensuring that the tactical teams' use of force was implemented in accordance with federal and state law and DOC use of force regulations and policies, and for reviewing all uses of force within DOC. Defendant Primack is now the Assistant Deputy Commissioner of Field Services, where he is responsible for managing Special Operations and Investigative Services. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Primack was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual and official capacities.

27.     Defendant Steven P. Kenneway ("Defendant Kenneway") was the Superintendent of SBCC from February 2019 to on or about May 6, 2020, including

during the Retaliatory Force Campaign. He was the chief administrative officer and oversaw all operational aspects of SBCC. He was responsible for authorizing the use of chemical agents at SBCC, ensuring that all uses of force at SBCC complied with state and federal law and DOC use of force regulations and policies, and reviewing all uses of force within SBCC. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Kenneway was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual and official capacities.

28.     Defendant Dean Gray ("Defendant Gray") is and has been the Superintendent of SBCC since on or about May 6, 2020. He is the chief administrative officer for the prison and oversees all operational aspects of SBCC. He is responsible for ensuring that all uses of force at SBCC comply with state and federal law and DOC use of force regulations and policy. He is responsible for authorizing the use of chemical agents, ensuring that all use of force at SBCC was implemented in accordance with federal and state law and reviewing all uses of force within SBCC. During the Retaliatory Force Campaign, he was a Deputy Superintendent at SBCC. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Gray was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual and official capacities.

29.     Defendant Ronald Gardner ("Defendant Gardner") was at all times relevant to the Complaint the Director of Security at SBCC. He is responsible for overseeing security at SBCC and ensuring that all uses of force at SBCC comply with state and federal law. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Gardner was acting within the scope of

his employment as an employee of DOC and under color of state law. He is sued in his individual and official capacities.

30.    Defendant Donald Denomme ("Defendant Denomme") was a DOC captain assigned to the tactical teams during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Denomme was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

31.    Defendant David Brien ("Defendant Brien") was a DOC captain assigned to the tactical teams during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Brien was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

32.    Defendant Paul Birri ("Defendant Birri") was a DOC lieutenant at SBCC assigned to the tactical teams during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Birri was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

33.    Defendant Keith Houle ("Defendant Houle") was a DOC lieutenant assigned to the tactical teams during the Retaliatory Force Campaign. As such, he was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint,

Defendant Houle was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

34.    Defendant Robert Deschene ("Defendant Deschene") was a DOC lieutenant at SBCC assigned to the tactical teams during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Deschene was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

35.    Defendant James Allain ("Defendant Allain") was a DOC lieutenant at SBCC assigned to the tactical teams during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Allain was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

36.    Defendant James Gearin ("Defendant Gearin") was a DOC lieutenant at SBCC during the Retaliatory Force Campaign. He was responsible for the direction and supervision of all staff under his control and was working in conjunction with the tactical teams during the Retaliatory Force Campaign. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Gearin was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

37.    Defendant Robert D'Amadio ("Defendant D'Amadio") was a DOC sergeant assigned to the tactical teams during the Retaliatory Force Campaign. He was

responsible for the direction and supervision of all staff under his control. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant D'Amadio was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

38.   Defendant Joseph Bellini ("Defendant Bellini") was a DOC officer and assigned to the tactical teams during the Retaliatory Force Campaign. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Bellini was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

39.   Defendant John Madden ("Defendant Madden") was a DOC officer and assigned to the tactical teams during the Retaliatory Force Campaign. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Madden was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

40.   Defendant Evan Laranjo ("Defendant Laranjo") was a DOC K9 officer assigned to the tactical teams during the Retaliatory Force Campaign. At all times relevant to the Complaint and in relation to the allegations set forth in the Complaint, Defendant Laranjo was acting within the scope of his employment as an employee of DOC and under color of state law. He is sued in his individual capacity.

41.   Defendants Mici, Henderson, DePalo, Primack, Kenneway, Gray, and Gardner are collectively referred to as the "Administrative Supervisory Defendants."

42.   Defendants Denomme, Brien, Birri, Houle, Deschene, Allain, Gearin, and D'Amadio are collectively referred to as the "Uniformed Supervisory Defendants."

## FACTUAL ALLEGATIONS

### Souza-Baranowski Correctional Center

43.     SBCC is a maximum-security prison with approximately 1,410 beds. As of
January 6, 2020, 795 individuals were incarcerated there. The prison is a single building
with three floors; each floor has eight housing units, and each housing unit is identified
by a letter and a floor number—for example, N1. The prison is divided in halves: the
South Side and the North Side. The third-floor housing units are "restricted housing
units," commonly referred to as "segregation." The Health Services Unit ("HSU") is also
on the third floor.

44.     In January 2020, DOC reported that approximately two thirds of the
prisoners at SBCC were Black or Latinx (37% and 30%, respectively, or 67% total). In
DOC as a whole, roughly one-half of the population is Black or Latinx (27% Black and
26% Latinx, or 53% total).

45.     Officers at SBCC are overwhelmingly white. Of approximately 390 officers
assigned to SBCC, 82% are white. The supervisory ranks are even less diverse—of fifty
sergeants, 86% are white (43 of 50). All but one of twenty-two lieutenants are white;
there is one Latinx lieutenant. There is one Latinx captain out of seven captains. There
are no Black lieutenants or captains. On information and belief, the racial makeup of
SBCC staff in January 2020 was substantially similar.

46.     Before the N1 Incident, SBCC used the two sides of the prison to separate
individuals affiliated with opposing gangs as well as those with potentially serious
conflicts. In January 2020, and to this day, living conditions throughout SBCC are harsh
and restrictive. Prisoners spend at least 20 hours of each day locked in their cells, with
only a thin, unopenable window offering a view to the outdoors. DOC incarcerates most

people at SBCC in a thirteen-by-seven-foot cell housing two people.  Education,

programming, and work assignments are much more limited than at other prisons, as

are recreational opportunities. SBCC regularly deprives prisoners of access to scheduled

out-of-cell opportunities like yard time, library, classes, work or other programs,

claiming that there are not enough staff to cover these activities or that a lockdown or

other security reason renders them unfeasible. Limits on the amount and type of

property a person can have, how much one can buy from the prison canteen, and the

number of visitors one can have on their visitation list are also more restrictive than at

other prisons.

47.    Since SBCC opened in November 1998, DOC has managed the prison by

creating an atmosphere of physical punishment and psychological terror. It has done so

by relying on the unconstitutional use of force against the people incarcerated there.

Indeed, shortly after SBCC opened, DOC sent tactical teams to use force against those

housed in the North Side of the prison. The tactical teams conducted numerous forced

cell entries using chemical agents and tactical weapons, injuring prisoners and

destroying their property.

48.    A pattern and practice of unconstitutional use of force has emerged at

SBCC over the years, particularly when deploying tactical teams. Officers consistently

use force to punish and injure prisoners rather than to restore order, and

disproportionately target and verbally abuse prisoners of color. Officers also repeatedly

violate DOC's own rules governing force, including the requirement that force be the

least amount necessary, used only as a last resort, and never as punishment. And,

officers violate the requirement that all planned force be recorded with a handheld

camera, thus limiting their accountability for excessive uses of force. DOC fails to

investigate allegations of excessive force or take disciplinary action against officers who use excessive force.

49.    After deploying excessive force, DOC staff have historically and repeatedly denied medical care, destroyed prisoners' property, prevented prisoners from filing grievances, and interrupted prisoners' ability to communicate with the outside world.

50.    In June 2012, after an officer was stabbed, DOC responded with immediate force against all men in the unit, including the widespread use of chemical agents. Approximately 14 men, all prisoners of color, were forced into excessively tight restraints and locked in small visiting booths for approximately nine hours awaiting investigatory interviews. During that time, DOC provided no medical care, no decontamination from chemical agents, no food, and no bathroom breaks. DOC then deployed tactical teams that stayed at the prison to conduct repeated "shakedowns"— cell by cell searches for contraband—for approximately two weeks.

51.    In August 2018, DOC deployed tactical teams to SBCC's North Side purportedly in response to an assault on an officer that occurred on the South Side of the prison. The tactical teams burst into the cells of several Black and Latinx men without warning and without issuing handcuff orders, in violation of policies designed to de-escalate situations and avoid the use of force. The teams came with K9s and weaponry, the laser sights from their pepper ball guns alerting the prisoners that they were in the crosshairs of the officers' weapons. Even when prisoners lay on the ground to demonstrate compliance, the tactical teams jumped on top of them—in one instance stepping on a man's neck to hold him down—and beat them inside the cells outside the view of hallway cameras. Upon information and belief, none of the DOC officers or supervisors were subjected to any form of discipline as a result of this conduct.

52.     DOC deployed tactical teams to SBCC at least nineteen times from 2017 through 2020, not including the eight months in 2019 and 2020 during which tactical teams were at the prison for two shifts daily.

53.     The violent atmosphere at SBCC is reflected in high rates of use of force against prisoners as well as high rates of assaults on staff. SBCC prisoners consistently report more incidents of staff brutality than at any other prison or jail in Massachusetts. DOC has reported that each year from 2017 through 2020, there were six to eight assaults on staff at SBCC resulting in serious injury—more than at any other DOC prison in each year except one; assaults on SBCC staff with minor or no injury also exceeded those at other prisons each year. The hostility, distrust, and violence result from the continuing failure of supervisory staff and officials, including the Administrative Supervisory Defendants and, when they have been assigned to SBCC, the Uniformed Supervisory Defendants, to enforce DOC written policies and procedures designed to protect prisoners' safety and well-being.

54.     The Administrative Supervisory Defendants have tolerated chronic violence between staff and prisoners at SBCC for years. The ongoing tensions make it likely that another altercation, like the N1 Incident, will occur in the future and that DOC will once again deploy unconstitutional force and brutality in response. The historical deployment of tactical teams at SBCC, including during the Retaliatory Force Campaign, shows that there is substantial risk that further deployments in response to prison incidents will result in the violation of prisoners' constitutional rights and serious harm.

**DOC Policies Governing Use of Force**

55.     DOC's written regulations, policies, and procedures closely regulate the use of force. Along with the Massachusetts and United States Constitutions, these written rules set strict limits on officers' authority to use force against prisoners. Scrupulous adherence to rules governing the use of force protects incarcerated people from abuse. The Administrative Supervisory Defendants' failure to require compliance with these rules caused Plaintiffs and class members to be subjected to arbitrary and excessive force during the Retaliatory Force Campaign and continues to place them at risk of physical and psychological harm. DOC use of force regulations, 103 CMR 505, define "reasonable force" as "the least amount of force necessary in a manner to carry out" a permissible action. Excessive force is defined as any force that exceeds that minimum amount of force necessary. The regulations prohibit the use of excessive force and the use of force as punishment or discipline. The regulations also require that an employee report any excessive force to a supervisor.

56.     DOC also has Standard Operating Procedures for the use of force. These include a Pyramid of Force, which provides guidance on how officers must assess the risk with which they are faced and what defensive or offensive actions are permitted based upon that risk. The Pyramid is intended to ensure that all employees use force that is both reasonable and proportional to the risk facing them.

57.     DOC has additional requirements that apply to cell extractions, including ordering the prisoner to comply before commencing force (potentially eliminating the need to use force at all), providing medical care as soon as possible for a prisoner injured during a use of force, and immediately decontaminating the prisoner from any chemical agents used. DOC keeps this policy secret from the public and by doing so,

shields itself from accountability with respect to enforcement and implementation of the policy.

58.     After force is used, all staff who used or witnessed the force are required, by the end of their shift, to submit a report describing the incident in detail. All incident reports corresponding to a use of force, together with the reporting forms filled out by the higher-ranking staff and administrators and all video and other documents, are compiled into a Use of Force package. To ensure compliance with governing law and policies, the Superintendent must review and approve all Use of Force packages related to his or her prison. The Director of Special Operations must review all Use of Force packages throughout DOC.

59.     DOC has additional policies regarding the use of force in certain circumstances that it once again refuses to disclose to the public. These include the Disorder Management Policy, Forced Movement of Inmates, and policies governing the use of the Special Operations tactical and special response teams, and the use of K9s and specialty impact weapons. Defendant Mici declared a Major Disorder during the Retaliatory Force Campaign, thus invoking the Disorder Management Policy.

**The Retaliatory Force Campaign**

60.     On January 10, 2020, certain prisoners in the N1 unit at SBCC significantly injured several officers during the N1 Incident. Approximately 75 men ranging in age from their twenties to their sixties were in N1 that day. Their sentences varied widely; some were serving natural life, while others would complete their sentences and be released in a few months. The majority of the men in the N1 unit had no involvement in the N1 Incident. Approximately half of the men in the unit were locked in their cells during the incident and could not have engaged in the altercation.

Immediately following the N1 Incident, the prisoners who DOC believed were engaged in the altercation were removed from the unit. All other prisoners were locked in their cells.

61.     Within hours, Defendant Mici authorized deployment of the Special Operations Division at SBCC.  Although the N1 unit had been secured, the alleged participants sent to other prisons, and the immediate threat contained, tactical teams comprised of officers from multiple Massachusetts correctional facilities, under the command of the Special Operations Division, convened at the prison. The tactical teams went cell to cell in the N1 unit, forcibly extracting the men locked inside without giving them an opportunity to voluntarily exit. For these extractions, the tactical teams had an array of riot gear and weapons of extraordinary force but did not wear their name tags or use video cameras as required.

62.     At some point on January 10, 2020, after the N1 Incident, upon information and belief, Defendant Henderson met with approximately 100 tactical team and other officers and announced it was "time to send a message" to prisoners, directing the officers to punish and retaliate against prisoners by assaulting and injuring them. On information and belief, he stated, "The gloves are off." The unprovoked and unconstitutional violence that followed was part of an orchestrated effort by Defendants to intimidate, injure, retaliate against, and assert dominance over SBCC prisoners following, and as punishment for, the N1 Incident.

63.     At the direction of the Administrative Supervisory Defendants, the tactical teams remained on site at SBCC for many weeks following the N1 Incident. The teams repeatedly violated the constitutional rights of people throughout the prison. In many instances, Defendants Mici, Henderson, Primack, Kenneway, Gray, and/or Gardner

were present for and personally observed the violent and unjustified assaults yet did not intervene to halt them.

64.     During cell extractions, the tactical teams repeatedly used pepper ball guns to shoot hard balls of compressed chemical agents at men in cells.  Some officers stood on top of tables in the unit, training the laser sights of their pepper ball guns on the prisoners inside the cells. Most or all the officers who shot prisoners, however, did so while standing at close range inside the cell or at the cell door. Officers shot prisoners who were lying on the ground to show compliance, and some shot prisoners in the back.

65.     The tactical teams also struck prisoners with shields, and punched, kneed and kicked prisoners as the officers rushed in their cells without warning. The officers used this force against compliant prisoners lying on the floor. These beatings resulted in men being removed from cells with obvious, visible injuries, including facial contusions and bloody lacerations. Tactical team officers repeatedly slammed the heads of prisoners into floors and walls, often grabbing the prisoner by the hair to do so.  Officers grabbed and squeezed prisoners' testicles, or stepped on or kicked their testicles.

66.     From the N1 cells, the tactical teams brought prisoners to the main corridor of the building on the second floor, between the "chow hall" and the visiting room.  At Defendant Henderson's direction, the tactical teams and SBCC staff forced the prisoners, still handcuffed behind their backs and shackled at their ankles, to face the wall and kneel without sitting back on their feet, or resting their head against the wall. Officers required prisoners to maintain this stress position for several hours. When prisoners tried to relieve pressure from their knees by sitting on their heels, or when they turned their heads to look down the corridor, officers smashed their heads against the wall, applied a pain compliance hold, yanked them up by the wrist restraints behind

their backs, or took them to a different area to be beaten. During this time, tactical teams patrolled the corridor with tactical weapons and barking K9s.  Officers repeatedly threatened prisoners that if they moved at all, the officers would shoot them or let the dogs bite them. The officers said they could do whatever they wanted because the cameras had been turned off and there were "no more rules." The threats of violence were not idle: while removing prisoners from the corridor, officers injured at least two men so severely that they had to be treated at outside hospitals.

67.    During the forced extraction of N1 cells, officers rotated prisoners from the main corridor into the visiting room, which was filled with numerous staff members, from line officers to Administrative Supervisory Defendants, including Defendant Kenneway. In front of all the assembled staff members, male and female, and many other prisoners, and under the direction of Defendant Kenneway, officers forced prisoners to strip naked and be searched, ordering them to reveal their bodies in various ways for inspection. Forcing prisoners to expose their naked bodies in such a public area was humiliating, degrading, and served no legitimate penological purpose.

68.    The prisoners' clothes, shoes, glasses, watches, and other personal items, once taken off, were dropped into one large pile in the room, contrary to the regular process of separately bagging and marking each person's property.  As overseen by Administrative Supervisory Defendants, including Defendants Kenneway, Gardner, and Henderson, the process used in this instance made it impossible to sort and return the property to each prisoner. As a result, the property taken from the N1 prisoners in the visiting room that day was never returned.

69.    After being strip-searched, prisoners were again forced to kneel in the visiting room until they were moved to the non-contact visiting booths, where DOC

investigators questioned them about the N1 Incident.  After questioning, staff returned the men to the main corridor to kneel yet again. Except while being strip searched, prisoners remained painfully shackled and handcuffed throughout this hours-long process, and were not allowed any food or drink, and some were denied scheduled medication. One man with diabetes did not receive his medication, causing him to suffer dizziness and faintness and placing him at risk of serious harm. Defendants Kenneway, Gardner, and Henderson, and on information and belief, other Administrative Supervisory Defendants, were present in the visiting room and the corridor throughout this time, observing, directing, and/or permitting the unlawful conduct of DOC staff.

70.     In the immediate aftermath of the N1 Incident, officers subjected prisoners to derisive, insulting, and demeaning language, including regular use of racial slurs.  Staff frequently made comments to prisoners that directly tied the officers' brutal actions to their anger over the N1 Incident. These comments include the following:

- "I don't give a f**k. You hurt one of ours, we hurt all of you," directed at a prisoner saying the kneeling hurt his injured knee.

- "You want to lose an eye m****r-f****r?" directed at a prisoner while an officer held the barrel of a pepper ball gun to his eye.

- "Did you send the hit?"

- "Oh, you like jumping COs, you f**king s**c?"

- "You s**cs and n*****s want to jump COs? Look who's talking now!"

- Defendant D'Amadio stating, "It's us versus you. When are you going to learn?"

- Defendant Gardner, who was present for and/or supervised most or all of the tactical teams during the Retaliatory Force Campaign, telling one prisoner, "You are going to pay for what your 'Brown and Black' buddies did to our fellow officers."

71.     In the weeks that followed, tactical teams continued to use many of the same techniques of excessive force as a means of retaliation and punishment.  Tactical teams continued to shoot men with pepper balls at close range in their cells, or in the back, and/or as they lay on the ground. Regular beatings continued. The use of chemical agents persisted, sometimes sprayed directly in prisoners' faces, with no regard for dangerous medical contraindications such as asthma.

72.     After the N1 Incident, officers, including Defendants Denomme and Allain, used Taser guns dangerously and without justification, and mostly on prisoners confined in cells.  The Taser guns were used both for "drive stuns," which involve direct, painful contact with the person's body, and for prong deployments, which frequently required medical staff to later remove the sharp prongs from under prisoners' skin, leaving marks where the prongs were torn out. Officers continued to use K9s to terrify and bite prisoners. The physical injuries prisoners sustained from dog bites ranged from puncture wounds necessitating shots to ward off infections, to torn flesh requiring hospital treatment.

73.     Throughout the Retaliatory Force Campaign, tactical teams and other DOC staff consistently disregarded proper procedure for safely and securely restraining a person in handcuffs and leg shackles. Officers intentionally applied restraints much tighter than permitted, leaving no space between the restraints and the skin, so that the restraints dug into prisoners' ankles and wrists. This caused intense pain and left swelling, bruising, red welts, and cuts on the wrists of many of the prisoners.  In some cases, the abusively tight use of restraints resulted in lasting damage, including numbness in fingers and hands, and involuntary hand cramping.

74.     Virtually all the force deployed during the Retaliatory Force Campaign fit DOC's definition of a planned use of force, which DOC regulations and policy require to be recorded with a handheld video camera with audio. The Administrative Supervisory Defendants knew and/or recklessly disregarded that the Uniformed Supervisory Defendants and other tactical team officers were systematically failing to record planned uses of force. These Administrative Supervisory Defendants personally witnessed but failed to correct numerous violations of this rule.

75.     The Administrative Supervisory Defendants were also aware of and approved other widespread violations of DOC policies and procedures by tactical teams. For example, tactical teams regularly failed to issue orders to comply and to announce their intent to use force before opening a cell door and shooting at a prisoner with pepper balls—a requirement designed to avoid the use of force on compliant prisoners. The Administrative Supervisory Defendants personally witnessed but failed to correct numerous violations of this rule.

76.     DOC is constitutionally required to provide access to necessary medical and mental health care to prisoners in its custody.  At SBCC, a prisoner can request medical or mental health care by submitting a "sick slip," which triggers a response from medical staff.  For emergency mental health care requests, such as from a prisoner who is suicidal or engaging in self-harm, the prisoner notifies unit officers that he needs immediate mental health attention. This is often referred to at SBCC as "calling crisis" or "Medic 5." Officers are required to relay the request to health staff who respond accordingly.

77.     At the beginning of the Retaliatory Force Campaign, Defendant Kenneway issued an order that drastically and unlawfully limited access to this necessary care. On

information and belief, Defendant Kenneway ordered that, until further notice, sick slips would not be accepted or processed; regularly scheduled appointments and chronic care appointments would not be held; and mental health crisis calls would not be responded to unless the emergency was "life or death."

78.    Defendant Kenneway's order was intended to harm prisoners and/or constituted deliberate indifference to their health and safety. The order caused unnecessary harm, including pain and suffering, and placed all prisoners at great risk. The order also had the effect of sending a message to officers that prisoners' safety did not matter, and that the officers could injure prisoners without consequences. Blocking access to medical and mental health providers also prevented injuries from being properly documented, creating yet another barrier to accountability for unlawful treatment of prisoners.

79.    The Retaliatory Force Campaign led many prisoners to self-injure or attempt suicide in or around January and February 2020. Despite being aware of this, Defendant Kenneway and DOC staff continued to limit prisoners' access to appropriate medical and mental health care. Upon information and belief, at one point during this time period, at least thirty prisoners were on active suicide watch within SBCC. Numerous prisoners formally notified DOC staff that they were a danger to themselves and might inflict self-harm, but these prisoners were ignored for hours or longer. Some officers taunted prisoners and encouraged them to harm themselves, even as prisoners cut themselves with razor blades, ingested foreign objects, fashioned nooses, and, in some cases, attempted to hang themselves.

80.    Taunting prisoners experiencing mental health crises and encouraging them to harm themselves is part of a pattern of cruelty and unconstitutional conduct

resulting in long-lasting harm to prisoners at SBCC. A Department of Justice investigation concluded that the conditions mentally ill prisoners are subject to while held on mental health watches in DOC prisons violate the constitutional rights of these individuals, and concluded that DOC was "engaged in a pattern or practice of resistance to rights protected by the Eighth Amendment." *See* U.S. Dept. of Justice, *Investigation of the Massachusetts Department of Correction*, November 17, 2020, available at https://www.justice.gov/opa/press-release/file/1338071/download.

81.     As a result of the Retaliatory Force Campaign and Defendants' conduct, prisoners were denied access to necessary medical care and suffered delays or denial of treatment for serious medical needs. On information and belief, the number of prisoners reporting mental health crises and need for immediate mental health intervention was unprecedented, due to the harsh and punitive conditions, the high-tension atmosphere in the prison, and the amount and degree of unjustified use of force deployed.

**Unlawful Treatment of the Named Plaintiffs**

**David Jackson**

82.     Mr. Jackson was housed in N1 on January 10, 2020. He was not involved in the N1 Incident.

83.     When a tactical team reached Mr. Jackson's cell at approximately 11:30 a.m. or 12:00 p.m. on January 10, 2020, the officers yelled, "Get on the f*****g floor!" Mr. Jackson lay on the floor, face down. Despite his compliance, members of the tactical team, which included Defendant Houle, entered Mr. Jackson's cell, stomped on Mr. Jackson's head, and hit the back of his head with a shield at least twice, causing a laceration and bleeding.

27

84.     The tactical team then tightly handcuffed Mr. Jackson and led him down the hallway, pulling him by his thumbs and wrists rather than his arms, which caused extreme pain. The tactical team brought Mr. Jackson to the visitation room, where he was strip-searched in the large area containing other prisoners and numerous staff.

85.     Mr. Jackson was led to an attorney visitation room, where he was questioned about the N1 Incident. After questioning, the tactical team returned Mr. Jackson to the corridor outside of the visitation room. Mr. Jackson and other prisoners were then forced to kneel in the corridor for hours without moving. Requiring prisoners to maintain this stress position served no legitimate security or other penological purpose.

86.     During this time, Mr. Jackson saw Defendant Kenneway and other administrative staff in the hallway. None of them intervened to stop this torturous and unjustifiable treatment of Mr. Jackson and other class members.

87.     As a result of Defendants' conduct, Mr. Jackson suffered physical and emotional injuries including a laceration on the back of his head, swollen ankles, shoulder and wrist pain, lasting numbness in his right thumb, humiliation, distress, anguish and anger. Mr. Jackson sought medical treatment, but his request was unaddressed until January 29, 2020.

**Luis Saldana**

88.     Like Mr. Jackson, Mr. Saldana was housed in N1 on January 10, 2020, and was not involved in the N1 Incident. Along with Mr. Jackson and the other N1 prisoners who remained in the unit after those involved had been removed, Mr. Saldana was taken by tactical team officers to the corridor outside the visiting area.  There, on the order of Defendant Henderson, tactical teams forced Mr. Saldana as well as other N1 prisoners to

assume the shackled stress position for hours. During this time, Mr. Saldana's property was taken from his cell.

89.     Mr. Saldana and other class members were not permitted to sit back on their feet or otherwise move. After more than two hours, Mr. Saldana tried to readjust his feet.  In response, tactical team members, including Defendant Bellini, dragged Mr. Saldana by his wrists to a different hallway.

90.     There, officers stood him against the wall. Defendant Bellini slammed Mr. Saldana's face against the wall and swept his legs out from under him, causing him to smash his face against the floor, breaking the bones in his nose. Mr. Saldana's face was bleeding profusely. Rather than provide medical treatment, the officers covered his head with a "spit hood" even though he had not spit at anyone. Eventually a nurse directed that he be placed in a neck brace and transferred to an outside hospital.

91.     As a result of Defendants' conduct, Mr. Saldana suffered physical and emotional injuries including a broken nose, swelling and bruising on his face, head pain, humiliation, distress, anxiety, paranoia, and sleeplessness.

**Dwayne Diggs**

92.     On January 22, 2020, Mr. Diggs was alone in his cell in the L2 unit. He had no involvement in the N1 Incident. A tactical team entered his cell and officers demanded that he strip, bend over, and subject his naked body to close visual inspection. Mr. Diggs complied. Tactical team officers then restrained Mr. Diggs with handcuffs that he told them were too small and too tight.  "[W]e're going to f**k you up, n****r, if you don't put them on," one officer said. The tactical team officers were not wearing name tags.

93.     The tactical team then took Mr. Diggs from the unit in only his underclothes and shower shoes. As the tactical team brought Mr. Diggs through the unit, Mr. Diggs complained to Defendant Gardner that the handcuffs were too tight. After this, the tactical team slammed Mr. Diggs against a wall and tightened his handcuffs further, causing him to lose feeling in his hands. Despite having a duty to stop the officers from using excessive force on Mr. Diggs, Defendant Gardner instead stood by and allowed the officers to continue to violate Mr. Diggs's civil rights.

94.     The tactical team brought Mr. Diggs to the gym, where other L2 unit prisoners were standing against the wall. Mr. Diggs was forced to stand in the corner of the gym for approximately one hour as three officers took turns pointing their weapons at him. While he was out of his cell, the tactical team confiscated or destroyed Mr. Diggs's personal property, which he never saw again.

95.     Mr. Diggs was returned to his cell. Defendant Birri and a tactical team soon entered Mr. Diggs's cell armed with pepper ball guns, and Taser guns. A K9 stood outside the door. The officers handcuffed Mr. Diggs behind his back and held a pepper ball gun to his head. While Mr. Diggs was on his knees, restrained and defenseless in his cell, at least three officers punched and kicked him repeatedly. Throughout the day, Defendant Birri and other officers in this tactical team used degrading language and racial slurs against Mr. Diggs, calling him "c**t" and "n****r" repeatedly.

96.     The tactical team again took Mr. Diggs, clad only in his underclothes, out of his cell. This time, they paraded him past Defendants Kenneway and Mici, who stood in a nearby entryway. While Mr. Diggs yelled to Defendant Kenneway, the tactical team responded by slamming Mr. Diggs against the wall. Neither Defendant Kenneway nor

Defendant Mici intervened in or expressed disapproval of the excessive force that occurred in front of them.

97.     As a result of Defendants' conduct, Mr. Diggs suffered physical and emotional injuries including headaches, wrist pain and numbness, humiliation, anguish, fear, helplessness, nightmares, anxiety, and paranoia.

**James Jacks**

98.     Mr. Jacks was assaulted by tactical teams on multiple occasions. He had no involvement in the N1 Incident.

99.     On January 22, 2020, Mr. Jacks was in the N1 unit, where a tactical team had moved him the day before, with no property and wearing only boxers, a t-shirt, and slip-on shower shoes.

100.     Mr. Jacks suffers from serious mental illness and called for mental health crisis attention multiple times. Staff ignored his pleas for help, and he ultimately resorted to covering his window to get a response. Instead of the mental health professionals that Mr. Jacks needed, Defendant Henderson sent a tactical team to perform a "wellness check."

101.     When the tactical team, which included Defendants Brien, Denomme, and Birri, arrived at his cell, Mr. Jacks was standing at the door with his hands up. Without provocation or warning, Defendant Brien shot multiple pepper balls into the cell, hitting Mr. Jacks in the head. Mr. Jacks fell to the floor on his face. While he was face-down, defenseless, and being handcuffed, officers on the team shot him with a Taser gun. Just outside the cell door, a K9 barked aggressively.

102.     Mr. Jacks was taken to a nurse, but some of the officers who had just assaulted Mr. Jacks remained with him. During the examination, some of the officers

painfully bent his wrists behind his back, intimidating Mr. Jacks so that he would not report their assault on him.  Fearing further injury, Mr. Jacks did not report his injuries to the nurse. The nurse removed a Taser prong from his arm. When Mr. Jacks returned to his cell, he found that the few items that he had, such as his mattress and shower shoes, were gone. Mental health staff placed Mr. Jacks on "mental health watch," and DOC moved him to segregation unit L3.

103.    On January 23, 2020, at Defendant Kenneway's direction, tactical teams stormed into L3, purportedly in response to suicide attempts by men housed on that unit. Mr. Jacks yelled "They're violating dudes!" in response to seeing teams using unnecessary force on men incarcerated in the unit. A bald administrative official holding a clipboard responded to Mr. Jacks, "You ain't seen nothing yet," then wrote on his clipboard.

104.    Moments later, a tactical team led by Defendant Houle came to Mr. Jacks's cell. They physically assaulted him despite the fact that there had been no provocation by Mr. Jacks or justification for the use of force. The tactical team first ordered Mr. Jacks to step to the back of his cell. He complied, placing his hands on his head. Just as the day before, officers rushed into Mr. Jacks's cell, beat and kicked him, and painfully bent his wrists and ankles. They told him the assault was an "eye for an eye."

105.    As is typical when a person is placed on mental health watch at SBCC, Mr. Jacks was wearing only a suicide smock during the assault. His smock fell off as the team extracted him from his cell. He was forced to walk down the hall naked through feces-infested wastewater that had overflowed from another cell. Defendant Denomme was present and observed the use of force against Mr. Jacks but did nothing to intervene. Again, the offending officers remained in the room with Mr. Jacks during his

medical examination. And again, Mr. Jacks did not from report his injuries to the nurse because he feared retaliation.

106.    The tactical team was aware that Mr. Jacks was in the midst of a mental health crisis but denied him access to mental health care. The officers demeaned, threatened, and physically abused him—exacerbating his mental health crisis and intentionally causing him further physical and psychological injury.

107.    As a result of Defendants' conduct, Mr. Jacks suffered physical and emotional injuries including torn skin from a Taser prong, scrapes, pain, restricted breathing, headaches, humiliation, anxiety, depression, fear, paranoia, and mental instability.

**Davongie Stone**

108.    On January 22, 2020, Mr. Stone was assaulted in the N1 unit. He had not been housed in N1 on January 10 and had no involvement in the N1 Incident.

109.    After announcing that Defendant Henderson had authorized the use of force, tactical team officers, including Defendants Denomme, Birri, D'Amadio and Laranjo, stormed Mr. Stone's cell.  Defendant D'Amadio shot Mr. Stone with a pepper ball gun and Defendant Denomme shot his Taser gun at Mr. Stone twice, hitting him once in his right arm and once in his back. Defendant Laranjo directed his K9 to attack and bite Mr. Stone. The K9 bit him on his right shoulder.

110.    This caused Mr. Stone to drop to the floor, where he was beaten by other officers, who repeatedly picked up his head by his dreadlocks and slammed it against the concrete floor. The officers did not allow him to look at them, and when he tried to turn his head to see them, he was hit in the mouth with a blunt object. Staff also kicked, stomped, and punched Mr. Stone in the face. Defendant Birri repeatedly hit him with a

blunt object, including in the head. While assaulting Mr. Stone, officers called him
"n****r" and other racial slurs.

111.    During the attack, several of Mr. Stone's personal items, including books
and family photos, were taken and never returned.

112.    As a result of Defendants' conduct, Mr. Stone suffered physical and
emotional injuries. Among other injuries, Mr. Stone sustained two black eyes, a swollen
face, a split and bloodied lip that required stitches, and broken teeth, at least one of
which has since turned grey due to the damage. He also suffered anxiety, paranoia, and
flashbacks to childhood abuse.

**Xavier Valentin-Soto**

113.    Mr. Valentin-Soto was moved to the L2 unit on January 22, 2020, with
just his shower shoes, boxers, and t-shirt. The rest of his property had been taken from
him. He had been in this new cell for only a few hours, without incident, when he heard
tactical teams extracting and assaulting prisoners in the unit.  He was not involved in
the N1 Incident.

114.    Suddenly and without warning, a tactical team that included Defendants
Denomme, Allain, and D'Amadio opened his cell door. Mr. Valentin-Soto was sitting on
his bed. He raised his hands into the air with open palms to demonstrate compliance.
The tactical team ignored this and shot Mr. Valentin-Soto multiple times in the chest
with pepper balls.  Mr. Valentin-Soto stood up against the wall with hands behind his
back. An officer yelled "Who's Valentin?" Mr. Valentin-Soto identified himself and one
of the tactical team officers immediately punched him in the face, causing him to fall to
the floor.

115.     As Mr. Valentin-Soto lay on the floor, Defendants Denomme and Allain both shot him with Taser guns. Officers punched and kicked him. They then picked Mr. Valentin-Soto up by his braided ponytail and slammed him against the cell wall. Next, they handcuffed him, shackled his ankles, and pulled him from his cell barefoot.  When Mr. Valentin-Soto slipped in toilet water that had flooded out of a neighboring cell, the tactical team officers picked him up by his braid and pulled on his wrist restraints, inflicting severe pain. The officers repeatedly told Mr. Valentin-Soto not to look at them during the encounter. During the attack, Mr. Valentin-Soto had personal property destroyed or taken. This property was never returned or replaced.

116.     Defendant Kenneway witnessed part of this abuse, but he did not intervene or take any action to stop these obvious violations of Mr. Valentin-Soto's rights.

117.     The tactical team officers forced Mr. Valentin-Soto to walk barefoot through the toilet water and to the medical unit. Officers continued to assault him even as he received medical treatment and the Taser gun prongs were removed. Officers bent and twisted his wrists and fingers and used a baton or blunt object to stick into and put painful pressure on his legs.

118.     After leaving the medical unit, officers forced Mr. Valentin-Soto to remove his shirt and left him for hours in his cell, barefoot and shivering, in only his underwear. Officers did not offer Mr. Valentin-Soto a decontamination shower, despite his having been shot with pepper balls multiple times. Mr. Valentin-Soto asked that his injuries be photographed, but he was told "no" and that he was on "s**t bag status."

119.     Throughout the attack, tactical team officers yelled racist slurs at Mr. Valentin-Soto, calling him a "f*****g s**c," among other things. They forced him to

unbraid his hair. These comments and actions were intended to intimidate, cause harm, and "send a message"—just as Defendant Henderson had instructed the officers to do.

120.    As a result of Defendants' conduct, Mr. Valentin-Soto suffered physical and emotional injuries, including difficulty breathing, numbness, pain, bruising, loss of circulation in his wrists, humiliation, anxiety, paranoia, sleeplessness and anger.

**Raphael Rebollo**

121.    On January 23, 2020, Mr. Rebollo was in his cell in the L3 unit. He had no involvement in the N1 Incident.

122.    Tactical teams arrived in the L3 unit. He could hear the tactical teams beating nearby prisoners, so he fashioned a "prison mouthguard" out of toilet paper to protect his teeth in anticipation of an assault.

123.    Before a tactical team entered his cell, one officer yelled, "This is an N1 guy," indicating that Mr. Rebollo had previously been housed in the N1 unit. Mr. Rebollo was not housed in the N1 unit during the N1 Incident.

124.    As a tactical team, which included Defendant Houle, approached, Mr. Rebollo kneeled in his cell with his hands behind his head and stated, "I'm not doing anything." Despite his efforts to demonstrate compliance, the tactical team burst into his cell and assaulted him. Officers kicked Mr. Rebollo in the mouth, jumped on and kicked his leg, and slammed his head against the floor. They stomped on then ripped off a cast that was stabilizing and protecting Mr. Rebollo's hand, which was recovering from an earlier injury.

125.    After assaulting him, the tactical team cut off several of his braids.

126.    As a result of the Defendants' conduct, Mr. Rebollo suffered physical and emotional injuries, including a black eye, deep bruising on his leg, a bloody lip, and a

head injury that has caused lasting impairment. Mr. Rebollo believes that he lost
consciousness as a result of this attack. He required surgery to address the damage to
his hand. He also suffered humiliation, anxiety, and fear.

**Danavian Daniel**

127.    On January 24, 2020, Mr. Daniel and his cellmate were eating breakfast in
their cell, P1 number 25. Neither was involved in the N1 Incident. When Mr. Daniel
heard officers open the adjacent cell door, he went to the cell window to check on the
commotion outside. He discovered that some prisoners were laughing at an officer who
had apparently slipped in the hallway and fallen. An officer turned to him and said,
"We'll see if you think it's funny after this." The officer then told tactical team officers
that "Cell 25 was laughing."

128.    Moments later, officers, including but not limited to Defendants Bellini
and Birri, opened Mr. Daniel's cell door. The officers rushed in and threw Mr. Daniel to
the floor. They then punched and kicked him in the ribs and head, flipped him onto his
stomach, and held a Taser gun to his neck. A K9 stood in a threatening manner in the
cell doorway.

129.    One officer yelled at Mr. Daniel, "Move and I'll fry your Black a*s." While
Defendant Birri kept his boot to Mr. Daniel's backside to keep him down, another officer
stomped on Mr. Daniel and yelled, "It's Uncle Cracker!" Officers then threw Mr. Daniel
to the ground again and stomped on his head multiple times. The officers also pulled
Mr. Daniel's cellmate from the top bunk, causing him to hit his head on the wall before
slamming him to the floor.

130.    After the blows ceased, officers choked Mr. Daniel and his cellmate while
other officers ransacked their cell. These officers destroyed Mr. Daniel's property and

personal items and threw his belongings onto the floor and on top of him. Other officers ripped up the prisoners' shirts and threw their mattresses on top of them.

131.    Mr. Daniel heard officers yell profanities at another man, who was screaming in anguish as officers beat him in the adjacent cell. For weeks after the beating, that cell contained feces and blood.

132.    None of the officers submitted a report about the use of force against Mr. Daniel or his cellmate.

133.    After the officers left, Mr. Daniel requested medical treatment for his injuries, but none was provided. Later, a nurse passing through the corridor, who could see that Mr. Daniel was bleeding from his head, told him that "no one" was "being seen [by medical staff] at that time."

134.    As a result of Defendants' conduct, Mr. Daniel suffered physical and emotional injuries including a lacerated eye, bruising, headaches, dizziness, blurred vision, back and leg pain, as well as mental and emotional trauma, including nightmares and anxiety attacks.

**Demetrius Goshen**

135.    On or about February 6, 2020, Mr. Goshen was housed in K3 unit. He had no involvement in the N1 Incident.

136.    Individuals in K3 had been denied showers for the previous four days. Prisoners protested staff's continued denial of showers by blocking their windows, with the collective goal of prompting a lieutenant to come to the unit and intervene. However, after prisoners blocked their windows, Defendant Kenneway directed tactical teams to use force.

137.     Mr. Goshen heard a neighboring prisoner being gassed and beaten. Shortly after, a team of officers—some wearing tactical team uniforms and some wearing SBCC uniforms—cracked open Mr. Goshen's cell door without warning or provocation.

138.     Defendant Gearin immediately sprayed Mr. Goshen with chemical agents, temporarily blinding him, before the officers charged into the cell. The officer in front slammed Mr. Goshen against the wall with his shield and tackled him. Once Mr. Goshen was on the ground, team members kicked him in the ribs and genitals and punched him in the face. Officers handcuffed Mr. Goshen as he lay face down on the ground with an officer sitting on his back.

139.     One or more officers tightened Mr. Goshen's handcuffs excessively and painfully. Officers violently pulled Mr. Goshen's hair, which he wore in long braids, and used his hair as a handle to repeatedly slam his head into the cell floor. The officers pulled Mr. Goshen to a standing position, sprayed him again with chemical agents, beat him again, and forced him back to the floor.

140.     During this assault, Mr. Goshen heard officers call prisoners n****r and yell out, "Black lives don't matter!" The officers in his own cell spewed racist, anti-Latinx slurs at him such as s**c and wetb**k.

141.     The officers then removed Mr. Goshen from his cell, stripped off his pants in the corridor, and pushed him to his knees inside a visiting booth. Officers yanked Mr. Goshen's arms through the wicket on the booth door, pulling until his shoulder blades were against the door. This movement ripped his skin and caused significant pain. Mr. Goshen listened in fear as Defendant Gearin instructed officers to "Pull as hard as you can" and "Break his wrists."

142.     After the assault, medical staff bandaged Mr. Goshen's injured wrist, rinsed out his eyes, and cleared him to return to segregation. Officers then returned him to his cell, which was still contaminated from the chemical agents that had been discharged during the assault. In addition, all of Mr. Goshen's personal property was missing or destroyed. Only now did officers offer Mr. Goshen a shower.

143.     As a result of Defendants' conduct, Mr. Goshen suffered physical and emotional injuries, including a burning feeling to his eyes and skin, trouble breathing, a bloody nose, bruising, multiple lacerations, and lasting pain in his hands and wrists. He also suffered emotional trauma including anguish, fear, distress and anxiety.

**Supervisory Liability**

144.     The Administrative Supervisory Defendants planned, directed, encouraged, and/or condoned the widespread use of brutal and unnecessary force during the Retaliatory Force Campaign. These leaders and supervisors were, and those still employed by DOC remain, deliberately indifferent to the use of excessive and unjustified force against prisoners.

145.     After the N1 Incident was over, Defendant Henderson met with officers, including members of the Special Operations Division. He told them, in substance, to use violence to convey to prisoners that staff, not prisoners, ran the prison. On information and belief, he stated that it was "time to send a message," and that "[t]he gloves are off," thereby telling officers that ordinary rules regulating the use of force did not apply.

146.     Throughout the Retaliatory Force Campaign, Administrative Supervisory Defendants, including Defendants Mici, Henderson, Kenneway, and Gardner, and on information and belief, Defendants Primack, DePalo, and Gray, were present on many

occasions during which officers used force to inflict pain, rather than for any security, penological, or other legitimate purpose. In the presence of Administrative Supervisory Defendants, officers freely used excessive force, deployed tactical weapons and K9s without justification, and inflicted gratuitous pain and suffering.

147.    Administrative Supervisory Defendants failed to intervene to stop the abusive and unlawful treatment of prisoners. By their presence and their failure to order the excessive force to stop, they implicitly authorized and approved of this force. Knowing that these high-ranking officials condoned the conduct, officers felt emboldened to continue their abuse of prisoners.

148.    Uniformed Supervisory Defendants ordered, encouraged, condoned, abetted, and/or personally committed numerous acts of unjustified and excessive force. These supervisors commanded tactical teams and/or had supervisory authority over others within these teams. In these roles, they authorized and directed the use of force by subordinate officers.

149.    A primary responsibility of captains, lieutenants, and sergeants is to ensure that the actions of their subordinates comply with DOC policies and procedures. When they condone excessive force or use excessive force themselves, it conveys to officers that harming prisoners is not only acceptable, but also desirable or expected. It tells officers that they may ignore DOC's use of force policies. During the Retaliatory Force Campaign, as well as before and since, officers have freely and openly disregarded the requirements that force be used only for a legitimate purpose, that only enough force to accomplish such a purpose be deployed, that officers report all force they use, and that they report any excessive force by other officers.

150.    Administrative and Uniformed Supervisory Defendants directed, approved, and/or condoned numerous other violations of DOC's force regulations and written policies during the Retaliatory Force Campaign. Among these is the regulation distinguishing between planned and spontaneous uses of force. This regulation defines a spontaneous use of force as follows:

> A spontaneous use of force occurs whenever there is an immediate need to control or restrain a person for the protection and safety of all concerned, e.g. when the person is participating in self harm, for self-defense or the protection of another who is at risk of imminent harm, to prevent an escape, or to prevent property damage which compromises institution safety.

103 CMR 505.07(3)(a).

151.    The regulation defines a planned use of force as follows:

> A planned use of force occurs when the level of threat by the inmate is not immediate, e.g., refusal to be put in restraints and exit a cell, threatening behavior, possession of a weapon, and property damage. There is time to activate a team, suit up in full extraction gear, and brief team members on strategy to be used. Every attempt should be made to diffuse the situation prior to a planned use of force.

103 CMR 505.07(3)(b).

152.    Under the regulations and DOC policy, all planned uses of force must be video recorded by a handheld video camera with audio capability. This required video documentation is meant to protect both prisoners and staff from unfounded allegations of improper conduct. It allows supervisors to review uses of force to ensure compliance with constitutional principles as well as DOC policies and procedures.

153.    Virtually all uses of force during the Retaliatory Force Campaign fit plainly in the definition of planned uses of force. Tactical teams and other staff falsely categorized the uses of force as spontaneous, however, to avoid the requirement that

they record their actions. Administrative and Uniformed Supervisory Defendants knew of and approved this method of avoiding oversight and accountability for uses of force.

154.    Before, during, and after the Retaliatory Force Campaign, Administrative and Uniformed Supervisory Defendants failed to supervise, monitor, and investigate officers' use of force, and to discipline excessive and unjustified force. These failures amounted to deliberate indifference to the safety of prisoners and to violations of their right to be free from excessive force. As a result, SBCC officers believed that they could, and continue to believe that they can, violate the rights of prisoners with impunity.

155.    Administrative and Uniformed Supervisory Defendants knew of and permitted several practices designed to obscure the truth about officers' use of excessive force. For example, officers were permitted to review surveillance video depicting the incident before writing their official reports, and they were permitted to confer with one another while writing the reports. On information and belief, during the Retaliatory Force Campaign the Administrative Supervisory Defendants coordinated officers' reports in order to falsely justify improper uses of force and to orchestrate a cover up of the ongoing abuse of prisoners.

156.    It has long been a widespread practice for SBCC officers to file false reports both to justify improper uses of force and to account for prisoner injuries. During and after the Retaliatory Force Campaign, officers falsely accused prisoners of aggressive actions in order to provide a pretext for having assaulted them. In one instance during the Retaliatory Force Campaign, several officers wrote reports falsely accusing a prisoner of breaking free from the officers and trying to kick a K9 dog; video of the incident belied these reports, showing that it was the dog who attacked the fully restrained, handcuffed, and defenseless prisoner.

157.    Administrative and Uniformed Supervisory Defendants are aware of and condone the longstanding and widespread practice of officers' falsely reporting prisoner assaults. These Defendants turn a blind eye to officers' dubious accounts of how prisoners received injuries.

158.    For example, in one incident report created as a result of the Retaliatory Force Campaign, Defendant Allain initially wrote in his report that a prisoner received abrasions on his *back* from pepper balls fired at him while he was "charg[ing]" *toward* staff. Rather than order an investigation of this potential abuse of dangerous weapons, and of this potentially false report, Defendant Henderson, recognizing the inconsistency in the recitation of the events, came up with his own, implausible version of events to justify the abrasions on the prisoner's back: that the prisoner "turn[ed] upon the initial volley." Defendant Henderson then requested that Defendant Primack, Defendant Allain's commander in the Special Operations Division, ask Defendant Allain if Henderson's version of events was true and, if so, to include it in the report. Unsurprisingly, Defendant Allain agreed and said that he would amend the report accordingly.

159.    Administrative and Uniformed Supervisory Defendants rarely sustain prisoners' complaints of excessive and unjustified force and rarely discipline officers for excessive force. The investigations are not thorough or impartial. Investigators often discount or fail to obtain evidence that might support the prisoner, such as photographs of prisoners' injuries and accounts of other prisoner witnesses. Investigators credit false, inconsistent, or unreliable officer accounts of the incidents. The sham investigatory process reinforces the message to staff that abuses will not be meaningfully scrutinized.

160.    During the Retaliatory Force Campaign, there were more than 100 encounters in which one or more officers used force against a prisoner. Many of the prisoners filed grievances and informal complaints about officers' use of excessive force. On information and belief, however, DOC found all but one use of force to be proper. In that case, a video captured the officer kicking the prisoner in the head.

161.    Even the uncommon jury verdict finding that an officer committed excessive force rarely harms an officer's career. For instance, in 2019, a federal jury found Defendant Houle liable for encouraging, condoning, acquiescing, or failing to intervene in his subordinate officer's excessive force against a prisoner during a tactical use of force at SBCC. *Schultz v. Houle*, No 16-cv-11774-PBS, 2018 WL 1188753, at * 1 (D. Mass Mar. 5, 2018). The prisoner was kicked in the head while being restrained by members of the tactical team. *Id.* at *4. The jury awarded $40,000 in punitive damages against Defendant Houle for acting with evil intent or reckless or callous indifference to the prisoner's constitutional rights. On information and belief, Defendant Houle received no discipline from DOC as a result of the incident or the verdict. Defendant Houle was a sergeant at the time but has since been promoted to lieutenant. DOC paid the judgment against him.

**Racially Motivated Violence against Black and Latinx Prisoners**

162.    During the Retaliatory Force Campaign, officers targeted Black and Latinx prisoners because of their race. Officers deliberately subjected Black and Latinx prisoners to greater and more frequent brutality than white prisoners.

163.    Officers grabbed, yanked, cut off, or ripped out Black and Latinx prisoners' dreadlocks and braids. Officers told one prisoner that they had a bet to see who could remove the longest dreadlocks. Officers yanked Mr. Valentin-Soto by his hair while

brutalizing him. Officers also grabbed Mr. Stone by his dreadlocks and smashed his face into the ground while calling him a n****r. Officers cut off Mr. Rebollo's braids and attempted to cut off another Latinx prisoner's ponytail while calling him racial slurs. These actions served no security or penological purpose. They were designed to humiliate Black and Latinx prisoners and to enforce white supremacy by "putting them in their place." Officers did not cut off or rip out the hair of white prisoners.

164.    Officers targeted Black and Latinx prisoners with racialized assaults to which white prisoners were not subjected. Officers intentionally used K9s as instruments of power and terror against Black and Latinx prisoners. On multiple occasions, officers sicced K9s onto Black and Latinx prisoners. The K9s bit the prisoners, causing painful lacerations and puncture wounds. These actions served no security or other penological purpose. On information and belief, officers did not sic K9s onto white prisoners.

165.    Throughout the Retaliatory Force Campaign, officers repeatedly used racial slurs such as n****r or s**c during assaults on Black and Latinx prisoners. White officers called Mr. Diggs a n****r multiple times as they assaulted him. White officers also used racial slurs against Mr. Valentin-Soto while they attacked him. Officers called Mr. Stone and his cellmate, another Black male, n*****s. Officers used racial slurs against a Latinx prisoner as they attacked him and broke his nose. Officers used racial slurs against another Black prisoner while threatening to shoot him and "f**k him up." There are many more examples.

166.    Administrative and Uniformed Supervisory Defendants observed, encouraged, condoned, directly participated in and/or allowed these tactics. Prisoners' grievances complaining of racist acts received dismissive, cursory denials.

167.   Defendants Gardner, D'Amadio, and Birri, and on information and belief, other Administrative and Uniformed Supervisory Defendants, did nothing when their subordinates used racist language. Administrative and Uniformed Supervisory Defendants thereby condoned and encouraged the racist hate speech and display of white supremacy. This conveyed to officers and prisoners alike that white supremacy and racial hostility toward prisoners of color were acceptable at SBCC and would go without repercussion. This tacit authorization reinforced a longstanding culture of racial hostility toward prisoners of color.

168.   Some tactical team officers openly displayed a hate symbol on their uniform that has been adopted by white supremacists and far-right extremists. Specifically, officers wore the "Punisher" symbol — a menacing and ghoulish human skull with long, spiked teeth—depicted here https://tinyurl.com/3yufnjfs—on their helmets. The Punisher is a comic-book character who ruthlessly avenges the death of his family, committing torture and murder in the name of law and order.

169.   Displaying any unauthorized symbol violates DOC policy, which requires officers to adhere to a strict dress code. Deviations from the standard uniform are cause for discipline. On information and belief, one or more Administrative or Uniformed Supervisory Defendants was present when officers wore Punisher symbols displayed outwardly on their helmets. On information and belief, no officer who wore the Punisher symbol was disciplined for wearing the symbol or was even told to remove it.

## CLASS ACTION ALLEGATIONS

170.   Named Plaintiffs Mr. Daniel, Mr. Saldana, Mr. Stone, Mr. Jackson, Mr. Rebollo, Mr. Jacks, Mr. Goshen, Mr. Valentin-Soto, and Mr. Diggs bring this action as a class action under Rule 23 of Federal Rules of Civil Procedure. Plaintiffs seek to pursue

class claims under Rule 23(b)(2) and Rule 23(b)(3).  The proposed classes as described below meet the requirements for class certification under Rule 23.

171.     **Rule 23(b)(2) injunctive relief class.** Under Federal Rule of Civil Procedure 23(b)(2), Plaintiffs Mr. Diggs, Mr. Jacks, Mr. Rebollo, and Mr. Stone seek to represent a class seeking injunctive and declaratory relief and consisting of the following people:

> All individuals who are now, or who will be in the future, incarcerated at Souza-Baranowski Correctional Center.

172.     **Rule 23(b)(3) damages classes.** Under Federal Rule of Civil Procedure 23(b)(3), Plaintiffs Daniel, Diggs, Goshen, Jacks, Jackson, Rebollo, Saldana, Stone, and Valentin-Soto seek to represent two classes seeking damages, and consisting of the following people:

> a)     All individuals incarcerated at Souza-Baranowski Correctional Center who were subjected to uses of force from January 10, 2020, to February 6, 2020; and

> b)     All Black and Latinx individuals incarcerated at Souza-Baranowski Correctional Center who were subjected to uses of force from January 10, 2020, to February 6, 2020.

173.     All three proposed classes meet the requirements of Rule 23(a). The injunctive relief class meets the requirements of Rule 23(b)(2). Both damages classes meet the requirements of Rule 23(b)(3).

**Rule 23(a)**

174.    **Numerosity.** The injunctive relief class and the damages classes are so numerous that joinder of all members is impractical. More than 100 prisoners were subjected to uses of force at SBCC from January 10, 2020, to February 6, 2020. The majority of these uses of force were against Black and Latinx prisoners. Joinder of so many individuals is impracticable.

175.    According to recent DOC population data, approximately 500 men are currently housed at SBCC. Joinder of all members of the injunctive and declaratory relief class, which also includes future prisoners, is thus impracticable.

176.    **Commonality.** Both classes meet the commonality requirement of Rule 23(a)(2). There are questions of law and fact common to the damages classes, and questions of law and fact common to the injunctive relief class. Many of the questions common to one class are also common to the others. Questions common to one or more classes include the following:

a.  Whether the Administrative Supervisory Defendants planned, directed, authorized, and/or condoned a campaign of excessive and unjustified force against prisoners in January and February 2020;

b.  Whether there existed as of January and February 2020, and whether there still exists, a pattern and practice of excessive and unjustified force by officers at SBCC, and whether Administrative Supervisory Defendants were deliberately indifferent to this pattern and practice, and whether they remain deliberately indifferent to it now;

c.  Whether Administrative Supervisory Defendants failed to supervise, monitor, and investigate officers' use of force, and to discipline excessive and unjustified force, before, during, and after January and February 2020, and whether these failures continue to this day;

49

d.  Whether the actions, and failures to act, by Administrative Supervisory Defendants described above in (a)—(c) caused officers to use excessive and unjustified force against class members in January and February 2020, and whether any continuing acts or failures to act by Defendants create a substantial risk of harm to class members;

e.  Whether the Administrative Supervisory Defendants' conduct violated, continues to violate, and/or creates an imminent threat of violating, class members' rights under the Eighth Amendment to the United States Constitution;

f.  Whether the Administrative Supervisory Defendants engaged in a conspiracy under 42 U.S.C. § 1983 to violate the rights of class members and to cover up Defendants' misconduct; and

g.  Whether the Administrative Supervisory Defendants' conduct constituted intentional discrimination against Black and Latinx prisoners based on race and thus denied the rights of class members in these groups to equal protection under the law, in violation of the Fourteenth Amendment to the U.S. Constitution.

177.    **Typicality.** Plaintiffs' claims are typical of the claims of the respective classes. All nine Plaintiffs seek to represent a damages class under Rule 23(b)(3). The four Plaintiffs currently housed at SBCC—Mr. Diggs, Mr. Jacks, Mr. Rebollo, and Mr. Stone—seek to represent the injunctive class under Rule 23(b)(2).

178.    Each of the Plaintiffs was a prisoner at SBCC during the Retaliatory Force Campaign. All were subjected to abusive and inhumane treatment that the Defendants ordered, directed, encouraged, condoned, participated in, and/or are otherwise responsible for. The violent and abusive tactics to which Plaintiffs were subjected during the Retaliatory Force Campaign are typical of those experienced by other prisoners throughout SBCC during this period. The same policies and practices, and deliberate indifference by Defendants that led to the violations of Plaintiffs' rights led to the

violations of the rights of class members. The Plaintiffs seek to prove that the conduct of Defendants violated the constitutional rights of the classes. The Plaintiffs currently housed in SBCC also seek to obtain an injunction and declaratory relief prohibiting Defendants from inflicting that abuse on prisoners in the future.

179.    **Adequacy of Representation.** Plaintiffs Diggs, Jacks, Rebollo, and Stone will fairly and adequately represent the interests of the injunctive relief class. These Plaintiffs, along with Plaintiffs Goshen, Jackson, Saldana, Valentin-Soto, and Daniel will fairly and adequately represent the interests of the damages classes. They have retained skilled counsel with experience in class actions, and constitutional and prisoners' rights litigation.

## Rule 23(b)

180.    **Injunctive class.** The injunctive class meets the requirements of Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class.

181.    **Damages classes.** The damages classes meet the requirements of Rule 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**CLAIMS**

**COUNT I**

**42 U.S.C. § 1983 – Cruel and Unusual Punishment (Eighth Amendment)**

182.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

183.    Defendants' conduct as described above deprived, and continues to deprive, Plaintiffs and class members of their right to be free from unnecessary and excessive force and punishment as guaranteed to them by the Eighth and Fourteenth Amendments to the United States Constitution.

184.    Defendants directed, authorized, encouraged, condoned, permitted, and/or personally inflicted excessive and unnecessary force and physical and emotional pain and suffering on Plaintiffs and other similarly situated prisoners. They did so maliciously, sadistically, intentionally, and wantonly, and not in a good faith attempt to maintain or restore order in the prison.

185.    Administrative Supervisory Defendants knew the substantial risk of serious harm that prisoners at SBCC faced from excessive and unnecessary force by tactical teams, but acted with deliberate indifference in making inappropriate use of tactical teams to execute the Retaliatory Force Campaign at SBCC.

186.    Administrative Supervisory Defendants failed to supervise, monitor, and investigate officers' uses of force, and to discipline excessive and unjustified force. Administrative Supervisory Defendants knew of but failed to take measures to curb the pattern and practice of excessive force at SBCC, including by tactical teams.  These failures constituted deliberate indifference to the rights and safety of prisoners in their care and custody.

187.    As a result of Defendants' unjustified and unconstitutional conduct, Plaintiffs and other prisoners similarly situated to them suffered physical and emotional injuries, including pain and suffering.

188.    The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to the rights of Plaintiffs and other prisoners similarly situated to them.

189.    The injuries of Plaintiffs and other similarly situated prisoners were proximately caused by the actions of the Defendants.

190.    Tactical teams executed the unconstitutional and cruel Retaliatory Force Campaign at SBCC pursuant to a policy or practice implemented and overseen by Defendants.

191.    The Administrative Supervisory Defendants had notice of widespread policies and practices of the tactical teams, pursuant to which prisoners were subjected to unconstitutional acts of violence and humiliation, as described more fully above, but did nothing to ensure that the prisoners at SBCC were treated humanely and in accordance with the rights afforded to them by the United States Constitution. To the contrary, the Administrative Supervisory Defendants knowingly permitted these unconstitutional practices to flourish by directly encouraging the type of misconduct engaged in by the tactical teams. For the same reason, these Defendants failed to provide adequate training and supervision of tactical team members, and failed to ensure that allegations of excessive and unlawful force were investigated. In this way, these Defendants violated the rights of Plaintiffs, and other prisoners similarly situated to them, by devising, implementing, and/or encouraging the policies and practices that gave rise to the foregoing constitutional violations.

192.    The above-described policies and practices were able to exist and thrive because the Administrative Supervisory Defendants were deliberately indifferent to the substantial risk that tactical teams and other officers, over which the Administrative

Supervisory Defendants had authority, would inflict serious physical and emotional injuries on prisoners.

193.    The injuries of Plaintiffs and those similarly situated to them were caused by Defendants, and by others at the Defendants' direction, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

194.    The Administrative Supervisory Defendants have failed to amend the policies and practices that allowed the unconstitutional acts of violence against prisoners as described above to occur, and that continue to place Plaintiffs housed at SBCC, and other members of the injunctive and declaratory relief class, at a substantial risk of serious harm, to which the Administrative Supervisory Defendants remain deliberately indifferent, of which there is a real and immediate threat, and for which there is no adequate remedy at law. Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated to them, seek injunctive relief from this Court to remedy the continuing constitutional violation.

## COUNT II

### 42 U.S.C. § 1983 – Conspiracy

195.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

196.    Defendants reached an agreement among themselves to deprive the Plaintiffs and all similarly situated prisoners of their constitutional rights, all as described in the various paragraphs of this Complaint.

197.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

198.    The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to the rights of Plaintiffs and other prisoners similarly situated to them.

199.    As a direct and proximate result of the illicit prior agreement referenced above, the rights of Plaintiffs and class members were violated and they suffered physical and emotional injuries, including pain, suffering, and emotional distress.

200.    Defendants continue to this day to conspire to deprive Plaintiffs, and other prisoners similarly situated to them, of their constitutional rights, and to cover up their own unconstitutional misconduct, as described in the various paragraphs of this Complaint. Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated to them, seek injunctive relief from this Court to stop the continuing constitutional violations.

201.    Plaintiffs, on behalf of themselves and all similarly situated prisoners, also seek compensatory and punitive damages against Defendants named in their individual capacities.

### COUNT III

### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)

202.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

203.    As described more fully above, Defendants each had a reasonable opportunity and a duty to prevent the violation of the constitutional rights of the Plaintiffs and similarly situated prisoners housed at SBCC, but they failed to do so.

204.   Defendants and individuals acting at their direction failed to intervene and did so intentionally, with malice, and/or with reckless indifference to the rights of the prisoners housed at SBCC.

205.   As a direct and proximate result of the misconduct of Defendants and individuals acting at their direction, the constitutional rights of Plaintiffs, and other prisoners similarly situated to them, were violated and they suffered physical and emotional injuries, including pain, suffering, and emotional distress.

206.   Because these policies and practices remain in place, there is a high probability that Defendants will fail to intervene when future violations of prisoners' constitutional rights occur.

## COUNT IV

### 42 U.S.C. § 1983 – Equal Protection (Fourteenth Amendment)

207.   Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

208.   Defendants intentionally subjected, and/or caused to be subjected, Plaintiffs and other Black and Latinx prisoners as described in Paragraph 172(b), to be treated differently from, and worse than, similarly situated white prisoners, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution.

209.   Defendants directed, encouraged, condoned, and/or personally inflicted force against Black and Latinx prisoners that was more brutal and more degrading than force used against similarly situated white prisoners. The disparate treatment was purposeful and was because of Black and Latinx prisoners' race. The unequal treatment served no compelling state interest or legitimate penological interest.

210.   Defendants' actions were taken intentionally, with malice, and/or with reckless indifference to the rights of Black and Latinx prisoners housed at SBCC.

210.   As a direct and proximate result of the misconduct of Defendants and individuals acting at their direction, Plaintiffs, and other prisoners similarly situated to them, were deprived of equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution. And they suffered physical and emotional injuries, including pain, suffering, and emotional distress.

## COUNT V

### Intentional Infliction of Emotional Distress

### (On Behalf of Named Plaintiffs Only)

211.   Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

212.   Defendants intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from their conduct.

213.   Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

203.   As a direct and proximate result of Defendants conduct, Plaintiffs suffered severe emotional distress that no reasonable person should be expected to endure.

### REQUEST FOR RELIEF

On behalf of themselves and all others similarly situated, Plaintiffs request that the Court enter an order:

1. Awarding compensatory and punitive damages against all Defendants except those named only in their official capacity;

57

2.  Declaring that the acts, omissions and practices of Defendants described above violate Plaintiffs' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution;

3.  Permanently enjoining the Defendants, their agents, subordinates, employees, and all others acting in concert with them from continuing the illegal acts, omissions and practices described above;

4.  Ordering Defendants to formulate a remedy subject to the Court's approval and modification if necessary to end the pattern of excessive force against prisoners at SBCC, including:

    a.  Adequate policies governing the use of force against prisoners, including a protocol for the monitoring of the use of force;

    b.  Adequate investigation of all use of force incidents, with investigations performed by personnel unconnected to the attack under investigation;

    c.  Appropriate discipline of staff members found to be involved in the improper use of force or improper threats of violence against prisoners, or the failure to report use of force incidents;

    d.  Appropriate training in the use of force; and

    e.  Appropriate selection and supervision of staff involved in tactical and special operations teams.

5.  Exercising the Court's continuing supervisory authority over Defendants to ensure compliance with all injunctive relief resulting from this litigation;

6.  Awarding Plaintiffs reasonable costs and attorneys' fees; and

7.  Granting Plaintiffs such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial on all claims and issues so triable.

January 10, 2022

Respectfully submitted,

DWAYNE DIGGS, DEMETRIUS GOSHEN, JAMES JACKS, DAVID JACKSON, RAPHAEL REBOLLO, LUIS SALDANA, DAVONGIE STONE, XAVIER VALENTIN-SOTO, and DANAVIAN DANIEL,

By

/s/*Lauren Petit*
Lauren Petit (BBO # 640410)
James R. Pingeon (BBO # 541852)
David Milton (BBO #668908)
Kristyn J.E. Henry (BBO #686668)
**Prisoners' Legal Services of Massachusetts**
50 Federal Street, 4th Floor
Boston, MA 02110
lpetit@plsma.org
jpingeon@plsma.org
dmilton@plsma.org
khenry@plsma.org
(617) 482-2773

Anthony E. Fuller (BBO # 633246)
Gregory F. Noonan (BBO # 651035)
Julia McLetchie (BBO # 671106)
Elizabeth C. Pignatelli (BBO # 677923)
Alexandra G. Watson (BBO # 676145)
Courtney A. Caruso (BBO # 687642)
**Hogan Lovells US LLP**
125 High Street, Suite 2010
Boston, MA 02110
anthony.fuller@hoganlovells.com
gregory.noonan@hoganlovells.com
julia.mcletchie@hoganlovells.com
elizabeth.pignatelli@hoganlovells.com
alexandra.bailey@hoganlovells.com
courtney.caruso@hoganlovells.com
(617) 371-1000

*Counsel for Plaintiffs*