## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DWAYNE DIGGS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>CAROL MICI, ET AL.,<br><br>Defendants. | 22-cv-40003-MRG |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT

## INTRODUCTION

Plaintiffs submit this memorandum in support of the parties' Joint Motion for Final Approval of the Settlement ("Joint Motion") in this civil rights class action. The settlement agreement ("Agreement") provides that the Commonwealth of Massachusetts, on behalf of Defendants, will pay $6,750,000, of which $5,750,000 is allocated to Class Member payments and $1,000,000 represents attorneys' fees and costs. The Agreement also requires the Department of Correction ("DOC") to make policy changes and take other steps to reduce the likelihood that the unconstitutional brutality and racial violence alleged in the Complaint will recur. The Agreement is attached as Exhibit 1 to the Joint Motion.

The Court granted preliminary approval of the settlement on May 30, 2025. Dkt. No. 109. All Class Members received individual notice of the settlement whenever possible; notice was otherwise provided by multiple methods designed to reach as many Class Members as

possible. Of the 159 Class Members identified by the parties, 137, or 86%, submitted claim forms—an extraordinarily high participation rate. An additional 3 Class Members not previously identified submitted approved claims. No Class Members filed objections, and only 3 opted out. These figures demonstrate the adequacy of notice to the class and signify the overwhelmingly positive reaction to the settlement by the class. If the Court approves the Agreement, each Class Member who submitted a claim will receive at least $10,000; most will receive approximately either $30,000 or $40,000.

The Agreement was reached after years of litigation and extensive arm's length negotiations, and it provides exceptional benefits to the class. Consideration of the factors pertinent to approval of a settlement under Rule 23(e)(2) fully supports a finding that the Agreement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). The Court should therefore allow the Joint Motion and grant final approval to the settlement. Plaintiffs are filing a separate motion for attorneys' fees and costs.

## BACKGROUND

### A. Procedural History

On January 10, 2022, the nine named Plaintiffs filed the Complaint seeking damages and injunctive relief under 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments to the Constitution. The Complaint alleges that, following an assault on several corrections officers at Souza-Baranowski Correctional Center ("SBCC") on January 10, 2020, Defendants and other DOC employees engaged in a monthlong campaign of unconstitutional retaliatory violence during which approximately 150 prisoners were subject to excessive force under the Eighth Amendment. Complaint ¶¶ 1-9. This brutality included

beating and kicking prisoners; gouging eyes; grabbing testicles; smashing faces into the ground or wall; deploying Taser guns, pepper ball guns, and other chemical agents; and ordering K9s to bite prisoners. Id. ¶ 3. The Complaint alleges that Black and Latinx prisoners were targeted for especially brutal and degrading treatment in violation of the Equal Protection Clause. Id. ¶¶ 4, 162-69, 207-10. The Complaint alleges that this "Retaliatory Force Campaign" was authorized by the highest levels of the DOC. Id. ¶ 6.

Defendants answered the Complaint on March 3, 2022, after which the parties engaged in extensive discovery for nearly three years. Declaration of David Milton ("Milton Decl.") ¶ 6. On September 30, 2024, the Court certified the following classes and subclass: (1) a damages class under Rule 23(b)(3) consisting of "all individuals incarcerated at Souza Baranowski Correctional Center who were subjected to uses of force from January 10, 2020, to February 6, 2020"; (2) an injunctive class under Rule 23(b)(2) with the same definition; and (3) a damages subclass under Rule 23(b)(3) and (d)(1), consisting of "all Black and Latinx individuals incarcerated at [SBCC] who were subjected to uses of force from January 10, 2020, to February 6, 2020" (the "Equal Protection Subclass"). Dkt. No. 83 at 2-3.

On May 21, 2025, after six months of negotiations, the parties reached the settlement Agreement, which the Court preliminarily approved on May 30, 2025. Dkt. No. 109.

**B. Summary of the Settlement Agreement**

The Agreement both provides substantial monetary relief to participating Class Members and requires DOC to take measures to reduce excessive force and racial discrimination by corrections officers. The following is a summary of the key terms of the

Agreement, which is described more fully in Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval. Dkt. No. 107 at 4-9.

### 1. Policy Changes

The Agreement requires DOC to make policy changes and take other steps to address the abuses that led to this lawsuit. These measures are designed to minimize instances of excessive force and racist behavior through training, rule clarification, deterrence, documentation, accountability, and discipline.

The Agreement requires DOC to clarify and tighten restrictions on the deployment of patrol K-9s, and to adhere to the prohibition on forced kneeling enacted after the Class Period. DOC agrees to explicitly prohibit racial discrimination and the use of racial slurs.

DOC commits to the new and increased training implemented since the Class Period, including training to officers at SBCC on proper techniques for forced moves, annualized training to special operations officers and staff, and standardized tactical training for all officers. DOC will also implement a diversity and implicit bias training into the Academy and annual staff training.

Special Operations Response Unit (SORU) officers will be required to wear name tags on the back of their uniforms, and a Video Response Team will automatically activate whenever a SORU is activated. DOC commits to imposing progressive discipline on officers who fail to activate their body-worn cameras as required. DOC agrees to expand requirements for photographing prisoners after a use of force.

DOC agrees to remove from the SORU any officer found to have used excessive force, and it will establish an anonymous tipline for employees to report misconduct or other

concerns. Other provisions include a requirement that DOC request and confirm individuals' self-reported racial identification at booking, and an agreement that DOC will facilitate PLS's participation in a project with the Vera Institute to improve the culture at DOC facilities.

1. **Payments**

On behalf of Defendants, the Commonwealth will pay $6,750,000 to settle Plaintiffs' claims. Of this amount, $5,750,000 (the "Class Fund") will be paid to Class Members. The Agreement provides that PLS will seek Court approval of $1,000,000 in combined attorneys' fees and costs to be paid from the total settlement amount.

Each Class Member who submitted a valid and timely Claim Form will receive a payment from the Class Fund. The following is a summary of the Distribution Formula:

a. Each Class Representative will receive a $25,000 Incentive Payment, subject to the Court's approval, in addition to the other applicable payments he receives as a Class Member;

b. Each Equal Protection Subclass Member will receive $10,000 (the "Equal Protection Payment") in addition to other payment(s) to which he is entitled;

c. Each Kneeling-Only Cohort Member will receive the Kneeling-Only Payment of $10,000. The Kneeling-Only Cohort consists of Class Members who were (1) made to kneel in the main corridor on the second floor of SBCC following the altercation in Unit N1 on January 10, 2020, but not (2) subjected to any other use of force during the Class Period. Kneeling-Only Cohort Members who are in the Equal Protection Subclass will also receive the Equal Protection Payment.

    d.   Each Class Member who is not a Kneeling-Only Cohort Member will receive a General Payment. The General Payment is an equal share of the remaining portion of the Class Fund after deducting all of the above, fixed-amount payments (i.e., Incentive Payments, Equal Protection Payments, and Kneeling-Only Payments). The dollar amount of each General Payment therefore depends on the total number of Class Members who submit valid claims and the groups that these Class Members fall into. (A higher number of total claims means a lower General Payment, as does a higher number of claims from Equal Protection Subclass members or Kneeling-Only Cohort members.)

    e.   All Class Members will receive either the Kneeling-Only Payment or the General Payment, but not both.

The entire Class Fund will be distributed to Class Members under the above Distribution Formula. There will be no residual funds.

Based on the claims filed to date, the number and type of payments to Class Members are as follows, subject to the stated qualifications. The total number of Class Members receiving payments is 140. Milton Decl. ¶ 31. If all 7 timely outstanding Generic Claims, as well as the one late Class Member Claim received, are approved, the total number of Class Members receiving payments will be 148. Id. Of the 148, 11 are in the Kneeling-Only Cohort, 137 are members of the General Payment Pool, and 113 are in the Equal Protection Subclass.

Id. In accordance with the Distribution Formula, the Class Fund will be allocated as follows.

Id.[1]

| Payment group | Members | Payment per member |
|---|---|---|
| All Claimants | 148 | $38,591 (average) |
| Equal Protection Subclass (EPS) | 113 | $10,000* |
| Kneeling-Only Cohort | 11 | |
| *Kneeling-Only not in EPS* | 1 | $10,000 |
| *Kneeling-Only in EPS* | 11 | $20,000 |
| General Payment | 137 | |
| *General Payment in EPS* | 34 | $31,277 |
| *General Payment not in EPS* | 103 | $41,277 |
| Incentive Payment | 9 | $25,000 |

*This amount is in addition to either the Kneeling-Only Cohort Payment or the General Payment; the total payment to EPS members in those groups is shown lower in the chart.*

### C. Notice to Class Members

In its Order granting preliminary approval, the Court approved the parties' proposed notice plan, including the Class Notice and Claim Form, and appointed Analytics Consulting LLC as Claims Administrator. Dkt. No. 109 ¶¶ 4, 6. The Court also approved the procedure described in the Agreement for deciding claims submitted by individuals not already identified as Class Members, as well as the Generic Notice and Generic Claim Form Id. ¶ 5. The Court ordered that the deadline for submitting claims, objections, and requests for exclusion (opt-outs) be 90 days from the date the Class Notice and Claim Form for Class Members ("Notice Packet") were mailed to Class Members. Id. ¶ 8. Analytics mailed the Notice Packet on June 6, 2025; the Claims Deadline was thus September 4, 2025. Milton Decl. ¶ 13. The Class

---

[1] Fourteen generic claims were filed after the claims deadline. Milton Decl. ¶ 29. Plaintiffs are filing a separate motion concerning the treatment of late claims.

Member Notice and Claim Form, and Generic Notice and Generic Claim Form, are attached as Exhibits 1-4 to the Declaration of Caroline Barazesh ("Barazesh Decl.").

Analytics mailed the Notice Packet to the last known address every Class Member for whom such an address was available at the time of the initial mailing and for whom an address was discovered through multiple search methods during the Notice Period. Barazesh Decl. ¶¶ 9-12. The declaration of Caroline Barazesh, the Analytics director responsible for settlement administration in this case, describes in detail the notice and claims administration process, including the searches made for Class Members' current addresses. Id. ¶¶ 6-19. As she states, 157 of 159 Class Members (98.7%) received notice. Id. ¶ 15, 18.

Plaintiffs' counsel made exhaustive efforts to locate Class Members to ensure that as many as possible would have the opportunity to participate in the settlement. As shown by the extraordinarily high response rate by the Class, these efforts, in tandem with those of Analytics, were effective. Below is a summary of those efforts, which are more fully described in the declaration of counsel. Milton Decl. ¶¶ 15-24.

Plaintiffs' counsel called, emailed, and mailed Class Members or their family members using contact information previously provided by the Class Members. Id. ¶ 16. Plaintiff's counsel searched for Class Members' contact information using numerous government and private person-locator databases. Id. ¶ 17. Counsel contacted county sheriff's departments to inquire whether any Class Members were in their custody. Id. ¶ 18. Counsel sent private direct messages to Class Members on Facebook and Instagram. Id. ¶ 19. Analytics sent Notice Packets to addresses obtained by any of these methods. Id. ¶ 20; Barazesh Decl. ¶ 11. As the

Claims Deadline drew nearer, counsel met over Zoom with Class Members in DOC custody who had not submitted claims, and delivered some Claim Forms in person. Milton Decl. ¶ 21.

Plaintiffs' counsel took various measures to provide notice of the settlement both to known Class Members who might not receive individual notice, and to any previously unidentified Class Members. Id. ¶ 22. Both PLS and Hogan Lovells, as well as DOC, issued press releases about the Agreement after its preliminary approval, resulting in widespread coverage of the settlement by Massachusetts media including the Worcester Telegram & Gazette, Boston Globe, Boston Herald, MassLive, WGBH, and WCVB, as well Yahoo! News. Id. Analytics hosted a case website (www.SBCCsettlement.com) with information about the settlement and printable claim forms. Id. ¶ 23. Both PLS and Hogan Lovells put information about the settlement on their respective websites, and PLS posted about it on social media. Id. PLS included information about the settlement in its quarterly newsletter, which is read by many current and former DOC prisoners. Id. ¶ 24.

As of this filing, 140 Class Members have filed valid claims, representing 86% (137 of 159) of previously identified Class Members and three generic claimants. Id. ¶¶ 30-31. Zero Class Members filed objections. Id. ¶ 30. Three Class Members opted out. Id. These figures not only reflect the efficacy of notice and outreach to the class, but also represent a ringing endorsement of the settlement by the class. *See Sow v. City of New York*, No. 21CV00533CMGWG, 2024 WL 964595, at *1 (S.D.N.Y. Mar. 5, 2024) (finding 79% response rate by class members in civil rights class action "extraordinary").

The original list of 159 Class Members ("the Class List") was compiled as a result of the parties' thoroughgoing respective investigations, over the course of five years, of events at

SBCC during the Class Period in early 2020. Id. ¶ 25. PLS' investigation and this lawsuit have been well known among people incarcerated at SBCC at the time and among the DOC population more generally. Id. PLS has regularly mailed updates to potential class members; provided information in response to countless inquiries from prisoners over the past five years; maintained a dedicated voicemail with information about the case, and timely contacted those who left messages. Id. Beginning with its initial investigation in early 2020, PLS asked Class Members and others at SBCC at the time to identify people who may have been subjected to a use of force, and contacted them when possible. Id. Finally, both the events themselves and this lawsuit have received substantial publicity. Id. In short, and Plaintiffs' counsel are confident that virtually all Class Members were identified before the settlement, and that individuals believing they were class members had every opportunity to learn about the case and contact Plaintiffs' counsel before then. Id.

The Agreement recognized, however, the possibility that some few people not on the Class List may have been subjected to a use of force but not yet identified. Id. ¶ 26. People claiming to be in this category could submit a Generic Claim Form, which required them to provide a sworn declaration describing in detail the facts and circumstances of the use of force to which they claim to have been subjected. Milton Decl. ¶ 26; Barazesh Decl., Ex. 4 (Generic Claim Form). Plaintiffs' counsel thoroughly investigated these claims by reviewing the declarations and supporting documentation provided by the claimants; records or information in the possession of Plaintiffs' counsel; and additional pertinent documents and information provided by DOC. Milton Decl. ¶ 27. If these materials reasonably established that the claimant was subjected to a use of force at SBCC during the Class Period and is therefore a

Class Member, the claim was approved. Id. ¶ 27. Of the 46 timely Generic Claim Forms received, 36 were denied, 3 were approved, and 7 are still being investigated. Id. ¶ 29. Among the reasons claims were denied are the following: the misconduct of corrections officers described by the claimant did not constitute a use of force; the claimant's assertion that a use of force took place was directly or implicitly contradicted by statements made by the claimant around the time of the Class Period (such as express denials of any use of force, and detailed complaints about officer misconduct toward the claimant that did not mention a use of force); or the claimant's description of the alleged use of force was conclusory and lacking in the material details requested on the Generic Claim Form. Id. ¶ 28. Notices of decision have been or will soon be sent to each claimant. Id. ¶ 28; Barazesh Decl. ¶ 13.

## DISCUSSION

### A. The Agreement is fair, reasonable, and adequate.

#### 1. Standard for final approval

The law favors settlement of class action suits. *See In re Pharm. Indus. Average Wholesale Price Litig.,* 588 F.3d 24, 36 (1st Cir. 2009); *Durett v. Hous. Auth. of City of Providence,* 896 F.2d 600, 604 (1st Cir. 1990). Federal Rule of Civil Procedure 23(e) requires a court to determine whether a proposed settlement that would bind class members is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e); *see Cohen v. Brown Univ.,* 16 F.4th 935, 943 (1st Cir. 2021). To make this determination, the court must "consider[] whether":

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate…; and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). "[T]he first two factors are 'procedural' in nature, 'looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement.'" *Cohen,* 16 F.4th at 943 (citation omitted). "As a corollary, the latter two factors guide "a 'substantive' review of the terms of the proposed settlement.'" *Id.* at 944.

"[T]he ultimate decision by the [district court] involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Cohen,* 16 F.4th at 943 (citation omitted). The decision is "entrusted to the district court's informed discretion." *Id.; see also Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56, 59 (1st Cir. 2021) ("[T]he district court enjoys considerable range in approving or disapproving a class action settlement.").

The advantages of the Agreement far outweigh the risks and delay of further litigation, and each of the factors under Rule 23(e)(2) favors approval of the Agreement.

## 2. Class representatives and class counsel have adequately represented the class

"The duty of adequate representation requires counsel to represent the class competently and vigorously and without conflicts of interest with the class." *In re Pharm. Indus.,* 588 F.3d at 36 n.12. And "[t]he court must be satisfied that the interests of the class representatives do not conflict with the interests of any of the class members." *Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech.*, No. 3:15-CV-30024-KAR, 2020 WL 1495903, at *3 (D. Mass. Mar. 27, 2020)(citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)).

There is no conflict between the Class Representatives and the class because they share the same legal claim and the same interest in the lawsuit's success. *See Nat'l Ass'n of Deaf,* 2020

WL 1495903, at *3; *Preston v. World Travel Holdings, Inc.*, No. 1:23-CV-12389-JEK, 2024 WL 3408705, at *2 (D. Mass. July 15, 2024). The Class Representatives have devoted extensive time and effort to the case in the five years since the events at issue.

Plaintiffs' counsel are "qualified and experienced and provided vigorous representation" of the class. *Nat'l Ass'n of Deaf,* 2020 WL 1495903, at *3. Prisoners' Legal Services has represented incarcerated people in class actions and other civil rights litigation for over 50 years. Milton Decl. ¶ 2. Lead attorneys David Milton and Lauren Petit have extensive experience in brutality and class action litigation. Id. ¶¶ 3-4. Attorney Milton has been practicing civil rights litigation for 21 years and has successfully represented plaintiffs and prisoners in numerous civil rights class actions. Id. ¶ 3. These include several in this District that, like this case, resulted in both monetary relief and policy changes benefiting prisoners. *See Baggett v. Ashe,* 41 F. Supp. 3d 113 (D. Mass 2014), *Garvey v. MacDonald,* 665 F. Supp. 2d 47 (D. Mass. 2009), and *Tyler v. Suffolk County*, 253 F.R.D. 8 (D. Mass. 2008). Attorney Petit has been practicing prisoners' rights litigation for more than 25 years. Id. ¶ 4. As head of PLS's Brutality Project for 17 years, she led thousands of investigations of officers' uses of force in Massachusetts jails and prisons, including many at SBCC, and has extensive experience litigating Eighth Amendment excessive force claims under 42 U.S.C. § 1983. Id. ¶ 4. The Hogan Lovells attorneys collectively have nearly nine decades of experience litigating complex civil and criminal cases in federal court. Id. ¶ 5.

Counsel conducted extensive discovery for nearly three years. Discovery included 17 depositions of multiple Defendants, other current and former DOC employees, and an employee of DOC's former medical provider. Milton Decl. ¶ 6. Counsel painstakingly

reviewed and analyzed the more than 99,000 pages of documents and hundreds of hours of video footage from the Class Period. Id. Counsel obtained answers to detailed interrogatories from all 18 Defendants. Id. Counsel consulted regularly with an expert in prison administration and uses of force. Id. ¶ 8. Before filing suit, counsel engaged in a comprehensive investigation of the facts underlying the case, including interviewing more than 100 class members and other witnesses. Id. Given "the nature and amount of discovery" conducted, counsel has "an adequate information base" to justify settling. *Preston*, 2024 WL 3408705, at *3 (citing Fed. R. Civ. P. 23(e)(2)(A)-(B) 2018 Comm. Notes); *see Hochstadt v. Boston Sci. Corp.,* 708 F. Supp. 2d 95, 107 (D. Mass. 2010) (explaining that "the applicable standard […] does not require that discovery be completed, but rather that sufficient discovery be conducted to make an intelligent judgment about settlement.").

Based on their experience and their knowledge of this case, Plaintiffs' counsel state without reservation that the Agreement merits approval. Milton Decl. ¶ 10. Where, as here, "the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Meaden v. HarborOne Bank*, No. 23-CV-10467-AK, 2023 WL 3529762, at *4 (D. Mass. May 18, 2023).

### 3. The settlement was negotiated at arm's length.

"A settlement is presumed to be reasonable when it is achieved by arm's length negotiations conducted by experienced counsel." *Nat'l Ass'n of Deaf,* 2020 WL 1495903, at *4 (citing *In re Pharm. Indus.*, 588 F.2d at 33). The Agreement here was reached after six months of active negotiations. Milton Decl. ¶ 9. The parties continued to litigate the case during this

14

time. These dealings demonstrate the absence of any collusion and that the negotiations "were conducted in a manner that would protect and further the class interests." *Preston,* 2024 WL 3408705, at *4 (citing 2018 Comm. Notes to Fed. R. Civ. P. 23(e)(2)(A)-(B)).

### 4.  The relief provided for the class is adequate, satisfying Rule 23(e)(2)(C).

The relief provided to the class is more than adequate; it is exceptional. Milton Decl. ¶ 10. As described above, the Agreement provides substantial monetary and non-monetary relief to the class. Each Class Member who submitted a valid claim will receive an average payment of more than $35,000, and all Class Members will benefit from far-reaching policy reforms that hold officers who use excessive force to account and reduce the likelihood that Class Members will be subject to unlawful force. Additional policy measures are similarly designed to lessen discrimination against Black and Latinx Class Members.

Rule 23(e)(2)(C) requires examination of whether relief for the class is adequate, "taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). These considerations all support approval.

**i. Cost, risks, and delays.** The benefits of the Agreement are especially advantageous in light of the "costs, risks, and delays" of continuing the litigation. *See* Fed. R. Civ. P. 23(e)(2)(C)(i). Establishing liability on a class-wide basis for excessive force under the Eighth Amendment, and disparate treatment of Black and Latinx subclass members under the Equal Protection Clause, presented formidable challenges. Plaintiffs' claims arise out of more than

160 uses of force over a monthlong period. Each incident typically involved numerous officers and witnesses, and generated a large evidentiary record including incident reports, video, photographs of injuries, grievances, internal investigations, and medical records. Milton Decl. ¶ 7. Plaintiffs alleged that these incidents were part of a coordinated operation authorized by high-ranking officials, adding an additional layer of factual and legal complexity to Plaintiffs' claims. *Cf. Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016) (noting that supervisory liability is a "difficult standard to meet"). Establishing supervisors' liability under the Equal Protection Clause for corrections' officers discriminatory conduct posed a still greater challenge. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)(holding that supervisors' mere knowledge of subordinates' discriminary purpose is insufficient; supervisors themselves must have discriminatory purpose to be liable for equal protection violation). Plaintiffs' damages claims faced the separate challenge of overcoming qualified immunity. And Plaintiffs' claim for injunctive relief—which would require a showing that the constitutional violations during the Class Period are part of an ongoing set of practices that continues to place Class Members at risk of harm—posed its own burdens. Plaintiffs' counsel believe Plaintiffs' claims are strong but recognize that obtaining a favorable verdict or injunction was no sure thing.

Moreover, a finding of liability would not necessarily mean a better outcome for Class Members than settlement. Any damages award might well be lower than what Class Members will receive under the Agreement. *See, e.g., Toliver v. New York City Dep't of Corr.,* 202 F. Supp. 3d 328, 335 (S.D.N.Y. 2016) (jury award of $1 in nominal damages on excessive force claim where plaintiff, while handcuffed and shackled, was pepper-sprayed … all over his body, including his eyes, nose, mouth, face, ears, neck, and chest, thus causing him 'excruciating'

pain"); *Johnson v. Hankins*, 2013 WL 3289034, at *3 (S.D. Miss. June 28, 2013)( jury award of $15,000 where "the defendants repeatedly punched, stomped, and kicked the plaintiff, to the point where he was visibly bruised and limping"). As one court explained, "Rare is the prisoner who succeeds in winning a case at all, much less winning more than nominal damages." *Farella v. Hockaday*, 304 F. Supp. 2d 1076, 1079, 1082 (C.D. Ill. 2004) (jury award of $1,000 where excessive force resulted in with numerous stitches in plaintiffs' ear …, "not an insignificant injury"). A jury would not be able to award any prospective relief. Further, Class Members who believed they could do better in an individual lawsuit had the right to opt out.[2]

Finally, even the best outcome through continued litigation would take years to achieve and consume great resources. Fact discovery was still ongoing when the Agreement was reached, and expert discovery had not begun. After any dispositive motions, a lengthy trial, and likely appeal, the entry of a final judgment would likely not have occurred for several years.

**ii. Method of distributing relief to the class.** The settlement provides reasonable and effective methods of distributing relief to the class, including the method of processing class-member claims. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii).

"[T]he claims processing method impose[d] a minimal burden on claimants and … adequately filter[ed] out unjustified claims to settlement funds." *In re N. Dynasty Mins. Ltd. Sec. Litig.*, No. 20-CV-5917 (TAM), 2023 WL 5511513, at *8 (E.D.N.Y. Aug. 24, 2023). The process for filing claims was simple and straightforward. Class Members needed only to complete, sign, and return the Class Member Claim Form to receive a payment. Generic

---

[2] Only three Class Members opted out. By contrast, several Class Members who had pending individual lawsuits raising claims covered by Agreement "opted in," that is, submitted claims to be part of this settlement rather than continue their own cases. Milton Decl. ¶ 30.

Claimants needed to provide a sworn statement with a detailed description of the alleged use of force to which they were subjected, including the time and location, the type of force and any weapons used, the number of officers, any injuries suffered and medical attention received, and whether they reported the incident to anyone. Barazesh Decl., Ex. 4. As described above, Plaintiffs' counsel conducted an in-depth investigation to determine the validity of these claims. This process was fair to all concerned: it allowed previously unidentified Class Members to participate in the settlement without undue burden, while protecting the Class Fund from unjustified claims.

**iii. Proposed award of attorneys' fees.** The proposed award of attorneys' fees, including timing of payment, is reasonable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed more fully in Plaintiffs' separate motion for attorneys' fees and costs, the requested fee of $986,397 is justified by the outstanding results Plaintiffs' counsel obtained for the Class, the complexity and duration of the litigation, and the enormous amount of time Plaintiffs' counsel devoted to the case. Plaintiffs' requested fee is less than 15 percent of the $6,750,000 total settlement, a lower percentage of the total fund than the 20 to 30 percent that "courts generally award." *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 349–50 (D. Mass. 2015) (internal citation omitted). PLS seek less than the norm in order to maximize the compensation for Class Members. Milton Decl. ¶ 38. Payment of attorneys' fees will be made at the same time that distribution payments are made to Class Members. Id. ¶ 34. Only PLS seeks attorneys' fees and costs. Hogan Lovells is not seeking any fees or costs despite spending more than 4,000 hours on the case and incurring roughly $96,400 in litigation costs. Milton Decl. ¶ 39.

    **iv. Agreements required to be identified.** No agreements have been made in connection with the proposal. Fed. R. Civ. P. 23(e)(2)(C)(iv).

    **5. The proposal treats class members equitably relative to each other.**

    The Distribution Formula equitably compensates Class Members according to the respective harms they suffered. "A plan of allocation is fair and reasonable as long as it has a reasonable, rational basis." *New England Biolabs,* 2022 WL 20583575, at \*4 (citation and internal quotation marks omitted). "In determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel." *Id.*

    "[T]he text of [Rule 23(e)(2)(D)] requires equity, not equality, and treating class members equitably does not necessarily mean treating them all equally." *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,* 85 F.4th 1070, 1093 (11th Cir. 2023); *see also* Fed. R. Civ. P. 23 (e)(2)(D), 2018 Comm. Notes (noting that paragraph D addresses whether "apportionment of relief among class members takes appropriate account of differences among their claims); *see also Follansbee v. Discover Fin. Servs., Inc.*, 2000 WL 804690, at \*5 (N.D. Ill. June 21, 2000) ("[D]istinctions in the damages awarded to different subclasses are not uncommon and will not defeat a class settlement so long as the distinctions are supported by a rational basis."). The different categories of payments—for the small group of Class Members subjected to forced kneeling but no other use of force; for the majority of Class Members, who were subjected to more direct uses of force at the hands of corrections officers; and for Equal Protection Subclass Members, who were subjected to additional harm because of their race or ethnicity—are commensurate with their respective injuries and claims. Milton Decl. ¶ 7.

Most Class Members who filed claims (93%) will receive an equal share of the General Payment Pool. As discussed, the General Payment is expected to be about $30,000. The Kneeling-Only Payment is $10,000. The different amounts reflect the difference in the nature of the force and resulting harm inflicted on the two groups. Milton Decl. ¶ 37. As mentioned, the uses of force applied to the larger group included beating and kicking; smashing faces; use of weapons and chemical agents, and K-9s. Id. It is fair to award greater damages for these severe and direct applications of force than for forced kneeling, however excruciating. Id.

The additional payment to members of the Equal Protection Subclass is justified by the harsher treatment this group received, such as officers shouting racist comments and yanking dreadlocks from people's heads. Id. The $10,000 payment reflects the additional constitutional injury and personal harm that these racially motivated actions caused. Id.

**D. The incentive payments are well-deserved and reasonable.**

The requested incentive payments of $25,000 to each of the Class Representatives appropriately reward them for their service to the Class. "Incentive awards serve to promote class action settlements by encouraging named plaintiffs to participate actively in the litigation in exchange for reimbursement for their pursuits on behalf of the class overall." *Physicians Healthsource, Inc. v. Vertex Pharms. Inc.*, No. 1:15-cv-11517-JCB, 2019 WL 13178515, at *4 (D. Mass. Mar. 21, 2019). The payments compensate Class Representatives for the extensive time and effort, and emotional energy, they have devoted to the development and prosecution of this case since early 2020, as well as for their loss of privacy, vulnerability to retaliation by DOC officers who managed their everyday life in custody, and exposure to adverse attention from being the public face of high-profile litigation against the DOC. Milton Decl. ¶ 41. *See,*

20

*e.g., Parker v. City of New York,* No. 15 CV 6733 (CLP), 2018 WL 6338775, at *7 (E.D.N.Y. Dec. 4, 2018) (noting "risks of retaliation exist when incarcerated persons bring suit against their jailers") (citations omitted); *Delandro v. Cnty. of Allegheny*, No. CIV.A. 06-927, 2011 WL 2039099, at *16 (W.D. Pa. May 24, 2011) (finding "sacrifice of anonymity" justified incentive award to prisoner class representative). Each Class Representative met regularly with counsel over the past five years, providing invaluable information that informed the Complaint, discovery, and settlement. Milton Decl. ¶ 41. For five years, the Named Plaintiffs have had to revisit the traumatic events at issue every time a case-related task was required of them. Many had particular difficulty when reviewing video footage and photographs of the events during the Class Period. Id. As a result of Class Representatives' service, Class Members will receive substantial monetary compensation and, if they are still incarcerated, meaningful injunctive relief. The amount of the incentive payment, $25,000, is in line with awards approved in other prisoner class actions in this District and elsewhere. Id. ¶ 42.[3] No Class Member objected to the incentive payments, which were referred to in the Class Notice and Generic Notice. Id.

---

[3] Courts in this District approved $20,000 incentive awards to the class representatives in each of these prisoner class actions, two of which are from 15 years ago. *Baggett v. Ashe,* C.A. No. 11–30223–MAP (settled 2015); *Garvey v. MacDonald,* C.A. No. 07–30049–KPN (settled 2010); and *Tyler v. Suffolk County,* C.A. No. 06–11354–NMG (settled 2010). Milton Decl. ¶ 42. Courts in other jurisdictions have awarded comparable amounts in prisoner cases. *See, e.g., Grottano v. City of New York,* 2021 WL 5563990, at *8 (S.D.N.Y. Nov. 29, 2021) ($20,000 and $30,000) *Delandro v. Cnty. of Allegheny,* 2011 WL 2039099, at *16 (W.D. Pa. May 24, 2011) ($18,000); *McBean v. City of New York,* 233 F.R.D. 377, 391-92 (S.D.N.Y. 2006) (approving awards ranging from $25,000 to $35,000 and finding these "solidly win the middle of the range" in other cases).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court (1) grant the Joint Motion for Final Approval of Settlement; (2) approve incentive payments of $25,000 to each Class Representative, and (3) retain jurisdiction to enforce the terms of the Agreement. A proposed Order is attached as Exhibit 1 to the Joint Motion.

Date: September 12, 2025

**RESPECTFULLY SUBMITTED,**

DWAYNE DIGGS, DEMETRIUS GOSHEN, JAMES JACKS, DAVID JACKSON, RAPHAEL REBOLLO, LUIS SALDANA, DAVONGIE STONE, XAVIER VALENTIN-SOTO, and DANAVIAN DANIEL

By their attorneys,

/s/ David Milton
Lauren Petit (BBO # 640410)
David Milton (BBO # 668908)
Kristyn J.E. Huey (BBO # 686668)
Rachel Talamo (BBO #713707)
**Prisoners' Legal Services of Massachusetts**
50 Federal Street, 4th Floor
Boston, MA 02110
lpetit@plsma.org
dmilton@plsma.org
khuey@plsma.org
rtalamo@plsma.org

Anthony E. Fuller (BBO # 633246)
Gregory F. Noonan (BBO # 651035)
Alexandra G. Watson (BBO # 676145)
Courtney A. Caruso (BBO # 687642)
Kayla H. Ghantous (BBO # 709197)
Fleming Farrell (admitted *pro hac vice*; D.C. Bar No. 90004877)
**Hogan Lovells US LLP**
125 High Street, Suite 2010

(617) 371-1000
anthony.fuller@hoganlovells.com
gregory.noonan@hoganlovells.com
alexandra.bailey@hoganlovells.com
courtney.caruso@hoganlovells.com
kayla.ghantous@hoganlovells.com
fleming.farrell@hoganlovells.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on the above date.

/s/ David Milton
David Milton (BBO # 668908)