**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DWAYNE DIGGS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>CAROL MICI, ET AL.,<br><br>Defendants. | 22-cv-40003-MRG |

**DECLARATION OF DAVID MILTON IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

I, David Milton, declare under penalty of perjury that the following is true and correct:

1. I am an attorney in good standing in the Commonwealth of Massachusetts and in this District. I am an attorney at Prisoners' Legal Services of Massachusetts ("PLS"), which along with Hogan Lovells US LLP served as counsel to Plaintiffs and the class. I am fully familiar with the facts in this case. I submit this declaration in support of the parties' Joint Motion for Final Approval of Class Action Settlement ("Joint Motion") and Plaintiffs' Motion for Attorneys' Fees and Approval of Notice of Settlement.

**Class Counsel**

2. PLS has represented prisoners in litigation for more than 50 years and has successfully litigated many prisoners' rights class actions. Recent cases include *Briggs v. Massachusetts Dep't of Correction,* No. 15-CV-40162-RGS, 2024 WL 178156 (D. Mass. Jan. 17, 2024); *Cantell v. Comm'r of Correction,* 475 Mass. 745 (2016); *Battle, et al. v. Hodgson, et al.*, No.

1873CV00020 (Mass. Super. Apr. 24, 2019); *Doe v. Mici,* No. 2019-828 (Mass. Super. July 2, 2019); and *Minich v. Spencer,* No. SUCV201500278, 2016 WL 3479000, at *1 (Mass. Super. May 17, 2016).

3. I am a Senior Staff Attorney at PLS. With Lauren Petit, another PLS Senior Staff Attorney, I have served as lead counsel in this case. I have been practicing civil rights litigation for 21 years, focusing almost exclusively on police misconduct and prisoners' rights litigation under 42 U.S.C. § 1983. I have represented prisoners and plaintiffs in numerous civil rights class actions, including several in this District that, like this case, resulted in both monetary relief and policy changes benefiting prisoners. *See Baggett v. Ashe,* 41 F. Supp. 3d 113 (D. Mass 2014), *Garvey v. MacDonald,* 665 F. Supp. 2d 47 (D. Mass. 2009), and *Tyler v. Suffolk County*, 253 F.R.D. 8 (D. Mass. 2008).

4. Attorney Petit has been practicing prisoners' rights litigation for more than 25 years. As head of PLS's Brutality Project for 17 years, she led thousands of investigations of officers' uses of force in Massachusetts jails and prisons, including many at Souza-Baranowski, and has extensive experience litigating Eighth Amendment excessive force claims under 42 U.S.C. § 1983.

5. The Hogan Lovells attorneys collectively have nearly nine decades of experience litigating complex civil and criminal cases in federal court, most often representing corporations and individuals in government enforcement actions and related litigation in numerous industries, including in the healthcare, life science, financial services, government contracting, and higher education industries. The litigation team includes two former Assistant United States Attorneys.

**Litigation and settlement negotiations**

6. The Agreement was reached after extensive discovery over the course of nearly three years. Plaintiffs' counsel took 17 depositions of multiple Defendants, other current and former DOC employees, and an employee of DOC's former medical provider. Plaintiffs' counsel reviewed and analyzed a massive amount of document discovery, which consisted of more than 99,000 pages of documents as well as hundreds of hours of video footage. Plaintiffs also obtained answers to detailed interrogatories sent to all 18 Defendants.

7. Plaintiffs' claims arose out of more than 160 uses of force over a monthlong period. Each incident typically involved numerous officers and witnesses, and generated a large evidentiary record including incident reports, video, photographs of injuries, grievances, internal investigations, and medical records.

8. Before filing suit, Plaintiffs' counsel engaged in a comprehensive investigation of the facts underlying the case for two years, interviewing more than 100 class members and other witnesses. Counsel has also consulted regularly with an expert in prison administration and uses of force.

9. The Agreement is a result of extensive, good-faith negotiations. The parties first engaged in settlement discussions in 2022 but were unable to reach an agreement. In November 2024, the parties reinitiated settlement discussions and engaged in vigorous arm's length negotiations for more than six months until reaching the Agreement. The parties continued to litigate the case during this time, with Plaintiffs' second motion to compel being filed and fully briefed in February 2025.

10. Based on Plaintiffs' counsel's experience and knowledge of the facts and claims in this case, we believe the Agreement to be fair, reasonable, and adequate, and in fact, to be an exceptionally good outcome to the litigation. All Class Members who filed a claim will receive at least $10,000; most will receive roughly $30,000 or $40,000. The Agreement also requires DOC to take numerous measures to reduce excessive force and racial discrimination by corrections officers.

11. The settlement is all the more advantageous when weighed against the costs, risks, and delays of further litigation. Were litigation to continue, establishing class-wide liability for excessive force and disparate treatment of Black and Latinx subclass members would present surmountable but formidable challenges. Even if liability were established for these claims, any damages award could be lower than what Class Members will receive under the Agreement. Despite the egregiousness of the force used against them, most Class Members did not suffer severe injuries. Injuries typically consisted of non-permanent bruises, swelling, abrasions, and/or pain on various parts of the body, as well as emotional distress. Class Members in the Kneeling-Only Cohort, who were not struck by officers or weapons, generally experienced lesser injuries than the rest of the class.

12. Finally, even the best outcome through continued litigation would take years to achieve and consume great resources. Fact discovery is still ongoing, and expert discovery has not begun. After any dispositive motions, a lengthy trial, and likely appeal, a final judgment would likely not occur for several years.

**Notice and outreach to Class Members**

13. On June 6, 2025, the Claims Administrator, Analytics Consulting LLC, mailed the Class Notice and Claim Form for Class Members ("Notice Packet") to the last known address of every Class Member for whom Plaintiffs' counsel or DOC had such an address. The Class Notice and Claim Form for Class Members prominently included the claims deadline of September 4, 2025, which, as ordered by the Court, was 90 days after the mailing. The Generic Notice and Generic Claim Form also prominently included this deadline.

14. The Declaration of Caroline P. Barazesh, the Analytics director responsible for settlement administration in this case, describes the notice and claims administration process, including the searches made for Class Members' current addresses, in detail. As she states, 157 of 159 Class Members (98.7%) received notice, and 137 Class Members (86.1%) filed claims.

15. Plaintiffs' counsel made exhaustive efforts to locate Class Members before and during the period for filing claims.

16. Plaintiffs' counsel called, emailed, and mailed Class Members or their family members using contact information previously provided by the Class Members.

17. Counsel searched for Class Members' contact information on the online people-search databases Accurint, TLO, Lexis People, and PeopleMap (by WestLaw). Counsel also searched on the following law enforcement websites: VINElink, which identifies individuals in DOC custody; the Federal Bureau of Prisons inmate locator website; the Online Detainee Locator System for individuals in the custody of Immigration and Customs Enforcement; and the Massachusetts Sex Offender Registry Board online database.

18. Counsel contacted the sheriff's departments in all 13 Massachusetts counties with correctional facilities to inquire whether any Class Members were in their custody.

19. Counsel sent private direct messages to Class Members on Facebook and Instagram and searched the internet for other leads to Class Members' whereabouts, including obituaries.

20. Notice Packets were sent to addresses obtained by any of these methods.

21. Beginning about one month after notices were first mailed, Plaintiffs' counsel met individually over Zoom with Class Members in DOC custody who had not submitted claims. Plaintiffs' counsel delivered some Claim Forms in person.

22. Plaintiffs' counsel took various measures to provide notice of the settlement both to known Class Members who might not receive individual notice through the above methods, and to any previously unidentified Class Members. Both PLS and Hogan Lovells (as well as DOC) issued press releases about the Agreement after its preliminary approval, resulting in widespread coverage of the settlement by Massachusetts media including the Worcester Telegram & Gazette, Boston Globe, Boston Herald, MassLive, WGBH, and WCVB, as well Yahoo! News.

23. Analytics hosted a case website (www.SBCCsettlement.com) with information about the settlement and printable claim forms. Both PLS and Hogan Lovells put information about the settlement on their respective websites, and PLS posted about it on Facebook, Instagram, LinkedIn, and BlueSky.

24. PLS included information about the settlement in its biannual newsletter, PLS Notes, which is read by many current and former DOC prisoners.

**Generic Claims**

25. The original list of 159 Class Members ("the Class List") was compiled as a result of the parties' respective thoroughgoing investigations, over the course of five years, into events at Souza Baranowski Correctional Center ("SBCC") during the Class Period in early 2020. PLS's investigation and this lawsuit have been well known among people incarcerated at SBCC at the time and among the DOC population more generally. PLS has periodically mailed updates to potential class members; repeatedly included information about the case in PLS Notes, our biannual newsletter sent to many people presently and formerly incarcerated in DOC; provided information in response to countless inquiries from prisoners over the past five years; and maintained a dedicated voicemail with information about the case, checked daily so that staff could timely contact those who left messages. Beginning with its initial investigation in early 2020, PLS asked class members and others at SBCC at the time to identify others who may have been subjected to a use of force, and contacted them when possible. Finally, both the events themselves and this lawsuit have received substantial publicity. In short, Plaintiffs' counsel are confident that virtually all Class Members were identified before the settlement, and that individuals believing they were class members had every opportunity to learn about the case and contact Plaintiffs' counsel before the settlement.

26. The Agreement recognized, however, the possibility that some few people not on the Class List may have been subjected to a use of force during the Class Period but not yet identified. People claiming to be in this category could submit a Generic Claim Form, which required them to provide a sworn declaration describing in detail the facts and circumstances of the use of force to which they claim to have been subjected.

27. In accordance with the approved procedure for evaluating Generic Claims, Plaintiffs' counsel thoroughly investigated these claims by reviewing the declarations and supporting documentation provided by the claimants; records or information in the possession of Plaintiffs' counsel; and additional pertinent documents and information provided by DOC. If these materials reasonably established that the claimant was subjected to a use of force at SBCC during the Class Period and is therefore a Class Member, the claim was approved.

28. Claims were denied for the following reasons: the claimant was never a DOC prisoner; the alleged use of force did not take place during the Class Period; the conduct of corrections officers described by the claimant, however improper, did not constitute a use of force; the claimant's assertion that a use of force took place was directly or implicitly contradicted by statements made by the claimant around the time of the Class Period (such contemporaneous statements included disavowals that force was used, or detailed complaints about officer misconduct toward the claimant that did not mention any use of force); the claimant's description of the alleged use of force was conclusory and lacking in the details requested on the Generic Claim Form. The Claims Administrator has sent or will send within the next few days notices of decision to each claimant.

29. Of the 46 timely Generic Claim Forms received, 36 were denied, 3 were approved, and 7 are still being investigated. At the time of this filing, 14 generic claims have been received since the claims deadline on September 4, 2025, at least 8 of which are invalid in addition to being untimely; 6 require investigation. Plaintiffs' counsel is filing a separate motion addressing the status of those claims.

**Class response and Class Member payments**

30. Of 159 Class Members on the Class List, 137, or 86%, filed valid claims. Of 46 timely Generic Claims submitted, 36 were denied, 3 were approved, and 7 are still being investigated. No Class Members filed an objection. Three Class Members opted out. One class member has filed a late claim, which Plaintiffs address in a separate motion concerning late claims. Several other Class Members with separate pending lawsuits raising claims covered by the Agreement "opted in," that is, submitted claims in this case rather than pursue their own claims.

31. Based on the actual claims filed to date, the number and type of payments to Class Members are as follows, subject to the stated qualifications. The total number of Class Members receiving payments is currently 140; if all 7 outstanding Generic Claims, as well as the one late Class Member Claim received, are approved, the total number of Class Members receiving payments will be 148. Of the 148, 11 are in the Kneeling-Only Cohort, 137 are members of the General Payment Pool, and 113 are in the Equal Protection Subclass. If the Court approves Plaintiffs' motion for attorneys' fees and costs, the total amount to be paid to Class Members, the Class Fund, will be $5,750,000. In accordance with the Distribution Formula in the Agreement, the Class Fund will be allocated as follows:

| Payment group | Members | Payment per member |
|---|---|---|
| All Claimants | 148 | $38,591 (average) |
| Equal Protection Subclass (EPS) | 113 | $10,000* |
| Kneeling-Only Cohort | 11 | |
| *Kneeling-Only not in EPS* | 1 | $10,000 |
| *Kneeling-Only in EPS* | 11 | $20,000 |
| General Payment | 137 | |
| *General Payment in EPS* | 34 | $31,277 |
| *General Payment not in EPS* | 103 | $41,277 |
| Incentive Payment | 9 | $25,000 |

**This amount is in addition to either the Kneeling-Only Cohort Payment or the General Payment; the total payment to EPS members in those groups is shown lower in the chart.*

**Summary of the Settlement Agreement**

32. The proposed Settlement Agreement ("Agreement") reached by the parties is attached as Exhibit 1 to the parties' Joint Motion for Final Approval of Settlement ("Joint Motion"). The Agreement includes an exhibit (Exhibit A) that identifies actions and policy changes required of the Department of Corrections (DOC). The following is a summary of the key terms of the Agreement:

***Policy Changes***

33. The Agreement requires DOC to make policy changes and take other steps to address the abuses that led to this lawsuit. These measures are designed to minimize instances of excessive force and racist behavior through training, rule clarification, deterrence, documentation, accountability, and discipline. These measures include the following:

- The Agreement requires DOC to clarify and tighten restrictions on the deployment of patrol K-9s (dogs used to control and apprehend people, rather than detect contraband), and to adhere to the prohibition on forced kneeling enacted after the

Class Period. DOC agrees to explicitly prohibit racial discrimination and the use of racial slurs.

- DOC commits to the new and increased training implemented since the Class Period, including training to officers at SBCC on proper techniques for forced moves, annualized training to special operations officers and staff, and standardized tactical training for all officers. DOC will also implement a diversity and implicit bias training into the Academy and annual staff training.
- Under the Agreement, Special Operations Response Unit (SORU) officers will be required to wear name tags on the back of their uniforms, and a Video Response Team will automatically activate whenever a SORU is activated. DOC commits to imposing progressive discipline on officers who fail to activate their body-worn cameras as required. DOC agrees to expand requirements for photographing prisoners after a use of force.
- DOC agrees to remove from the SORU any officer found to have used excessive force, and it will establish an anonymous tipline for employees to report misconduct or other concerns.
- Other provisions include a requirement that DOC request and confirm all individuals' self-reported racial identification at booking, and an agreement that DOC will facilitate PLS's participation in a project with the Vera Institute to improve the culture at DOC facilities.

**Payments**

34. On behalf of Defendants, the Commonwealth will pay $6,750,000. Of this amount, $5,750,000 will be paid to Class Members according to the Distribution Formula, summarized below. The Agreement provides that PLS will seek Court approval of $1,000,000 in combined attorneys' fees and costs to be paid from the total settlement amount at the same time as payments are first distributed to Class Members.

35. Each Class Member who submitted a valid Claim Form will receive a payment from the Class Fund (i.e., $5,750,000). The following is a summary of the Distribution Formula:

- Each Class Representative will receive a $25,000 Incentive Payment, subject to the Court's approval, in addition to the other applicable payments he receives as a Class Member;
- Each Equal Protection Subclass Member will receive $10,000 (the "Equal Protection Payment") in addition to other payment(s) to which he is entitled;
- Each Kneeling-Only Cohort Member will receive the Kneeling-Only Payment of $10,000. The Kneeling-Only Cohort consists of Class Members who were (1) made to kneel in the main corridor on the second floor of SBCC following the altercation in Unit N1 on January 10, 2020, but not (2) subjected to any other use of force during the class period. Id. ¶ 2(v). Class Members subjected to such other uses of force will not receive the Kneeling-Only Payment even if they were also made to kneel on January 10. Kneeling-Only Cohort Members who are also members of the Equal Protection Subclass will also receive the Equal Protection Payment.

- Each Class Member who is not a Kneeling-Only Cohort Member will receive a General Payment. The General Payment is an equal share of the remaining portion of the Class Fund after deducting all of the above, fixed-amount payments (i.e., Incentive Payments, Equal Protection Payments, and Kneeling-Only Payments). The dollar amount of each General Payment therefore depends on the total number of Class Members who submit valid claims and the groups that these Class Members fall into. In other words, a higher number of total claims results in a lower General Payment, as does a higher number of claims from Equal Protection Subclass members or Kneeling-Only Cohort members.
- All Class Members will receive either the Kneeling-Only Payment or the General Payment, but not both.

36. The entire Class Fund will be distributed to Class Members under the above Distribution Formula. Agreement ¶ 15. There will be no residual funds. Id.

37. The different categories of payments under the Agreement—for the small group of Class Members subjected to forced kneeling but no other use of force; for the majority of Class Members, who were subjected to more direct uses of force at the hands of corrections officers; and for Equal Protection Subclass Members, who were subjected to additional harm by virtue of their race or ethnicity—are commensurate with their respective injuries and claims. The difference in the respective size of the Kneeling-Only Payment and the General Payment reflects the difference in the nature of the force and resulting harm inflicted on Class Members in those groups. As mentioned, the uses of force applied to the General Payment group included beating and kicking; smashing faces into the ground or wall;

deploying Taser guns, pepper ball guns, other chemical agents, and K-9s. It is fair to award greater damages for these severe and direct applications of force than for forced kneeling, however excruciating. The additional payment to members of the Equal Protection Subclass is justified by the harsher treatment this group received, such as officers shouting racist comments and yanking dreadlocks from people's heads. The $10,000 payment reflects the additional constitutional injury and personal harm that these racially motivated actions caused.

**Attorney's Fees and Costs**

38. As of the date of this filing, Plaintiffs' counsel has spent nearly 9,000 combined hours on the case. PLS staff have spent more than 4,400 hours on the case. This total consists of approximately 3,120 hours of attorney time and 1,306 hours of paralegal time. Law students worked an additional 412 hours on the case. These hours will increase as PLS will spend substantial time to ensure the orderly administration of the settlement and to ensure that DOC complies with the policy changes and other nonmonetary terms of the Agreement. Plaintiffs' requested fee, $986,396, is 14.6 percent of the total settlement amount of $6,750,000. This is a lower percentage of the fund than courts in this District typically award. Plaintiffs seek a reduced fee in order to maximize compensation for Class Members. PLS faced a significant risk of not recovering any attorneys' fees or costs, as its fee agreement with the named Plaintiffs provided for attorneys' fees and recovery of costs only if Plaintiffs obtained monetary relief or if the Court awarded such fees and costs.

39. PLS incurred $13,603 in costs incurred during litigation. The largest of these expenses is the Claims Administrators' fee, which is $ 13,187. The remaining $416 is for travel

expenses during the case. PLS incurred many thousands more in expenses during its two-year pre-suit investigation but does not seek reimbursement for these.

40. Hogan Lovells staff spent more than 4,000 hours on the case, of which roughly 80% (3,200 hours) was attorney time. Hogan Lovells represented the class *pro bono* and does not seek attorneys' fees. Nor does Hogan Lovells seek reimbursement of its litigation costs, which are approximately $96,400 to date.

**Incentive Payments**

41. The nine Class Representatives have devoted extensive time, effort, and emotional energy to the development and prosecution of this case since the time of the events themselves in early 2020. Each Class Representative regularly met with counsel over the past five years, providing invaluable information that informed the Complaint, discovery, and settlement. Being Named Plaintiffs has meant a loss of privacy, vulnerability to retaliation by DOC officers who managed their everyday life in custody, exposure to adverse attention from being the public face of high-profile litigation against the DOC, and, for Class Members released since the Class Period, occasionally missing work and traveling in order to meet with counsel. For five years, the Named Plaintiffs have had to revisit the traumatic events at issue every time a case-related task was required of them. Many had particularly difficulty when reviewing video footage and photographs of the events of the Class Period to explain the scenes to counsel and to identify correctional officers and other Class Members, and provide critical context for the captured scenes.

42. The proposed amount of the incentive award to each Class Representative, $25,000, is in line with other awards in prisoner class actions in this District. In three

prisoners' class actions in this District for which I was plaintiffs' counsel, the court awarded $20,000 to each of the class representatives: *Baggett v. Ashe,* C.A. No. 11–30223–MAP (D. Mass, settled 2015); *Garvey v. MacDonald,* C.A. No. 07–30049–KPN (D. Mass., settled 2010); and *Tyler v. Suffolk County*, C.A. No. 06–11354–NMG (D. Mass., settled 2010). No Class Member objected to the incentive payments, which were referred to in the Class Notice and Generic Notice.

Dated: September 12, 2025

/s/David Milton
David Milton (BBO # 668908)

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David Milton
David Milton (BBO # 668908)